OPINION OF THE COURT
Edward H. Lehner, J.
The issue presented herein, on which there is a paucity of authority, is how to apply the warranty of habitability to a loft unit when (i) the subject premises were rented to the tenants as raw space, (ii) all internal improvements to make the premises amenable to residential living were made by the tenants, and (iii) the units are partially used for commercial purposes.
FACTS
The above two summary proceedings were tried together. The proof showed the following: petitioners acquired the building (146 Chambers Street) in 1977 and leased the entire second floor to respondents E. Jan Kounitz and Deborah Klein for a four-year period commencing May 1, 1977 at a base rental of $350 per month, and the entire fourth floor to Dean Aronson for a four-year term beginning June 1,1977 at a base rental of $315 per month; *744 each lease provided (i) that the premises would be used for an “artist’s studio or any legal usage”, (ii) that the tenant would “make all repairs and maintain” the premises and was taking the unit “as is”, (iii) any fixtures and partitions, etc., installed by the tenant would become the landlord’s property upon installation, and (iv) that the tenant would pay (as additional rent) a portion of increases in the real estate tax and a “fair share” of the gas bill; the parties understood that the tenants would reside in the premises and make alterations within the unit to make the premises suitable for habitation; at the time of the execution of the lease each of the floors was merely open space without fixtures or partitions; the tenants installed kitchen and bathroom facilities, erected partitions, did plumbing and electrical work, replaced windows, painted and plastered, and in general made such improvements as they desired in their respective lofts; the building is an interim multiple dwelling (IMD) and respondents are covered under article 7-C of the Multiple Dwelling Law (the Loft Law); respondents are now the only occupants of the building other than a store on the ground floor; and petitioner, prior to commencement of the lease term, constructed an enclosed stairwell and public halls from space that had been part of the large open space and replaced missing floorboards and glass in the windows.
As a result of disputes with respect to the condition of the building the tenants ceased paying rent as of April, 1980 (coincidentally the date from which rent may retroactively be collected under section 285 of the Multiple Dwelling Law). Unpaid rent claimed by petitioner for the second floor unit totals $17,178, computed as follows: $350 per month for 39 months (April, 1980 to June, 1983) and $441 per month for 8 months (July, 1983 to February, 1984). For the fourth floor petitioner claims $15,460.20, computed as follows: $315 per month for the same 39 months and $396.90 for each of the latter 8 months. The increase of 26% claimed as of July, 1983 is based on order No. 1 issued by the Loft Board (the Board). Respondents contend that the increase should be only 22%. Otherwise, the mathematical calculation of unpaid rent is not disputed.
Although the petitioners sought $337.78 from the respondents in each case for real estate tax escalation, that *745 claim was withdrawn at the commencement of trial. In addition, petitioner sought $1,311.99 in each case for respondents’ share of the gas bill. However, after it became evident that the claim could not be established because of petitioners’ inability to prove the “fair share” allocable to each tenant, this claim also was withdrawn.
THE WARRANTY OF HABITABILITY
Subdivision 11 of section 286 of the Multiple Dwelling Law provides that “[Residential occupants qualified for protection” pursuant to the Loft Law are “afforded the protections available to residential tenants pursuant to the real property law”. Accordingly since respondents are qualified residents of an IMD, the warranty of habitability (Real Property Law, § 235-b) is applicable to their tenancy.
In the leading case interpreting the warranty, the Court of Appeals in Park West Mgt. Corp. v Mitchell (47 NY2d 316, 329) stated that: “the duty of the tenant to pay rent is coextensive with the landlord’s duty to maintain the premises in habitable condition” (emphasis supplied) and that “the proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach.”
Obviously, when dealing with uninhabitable vacant space converted by a loft pioneer into living quarters, the application of the warranty must necessarily be different. The concept of separate standards for loft residents was recognized by our Appellate Term in Silverstein v Roof Bin (NYLJ, Dec. 16, 1982, p 7, col 2) where, in dicta, it said (col 3) that in: “defining the scope of the warranty and computing the amount of damages sustained by a loft tenant as a result of its breach, it may become necessary to draw a distinction between the standard of habitability to which an interim multiple dwelling may reasonably be expected to conform and the standard governing more conventional classes of housing accommodations.”
Although respondents argue that to “establish a standard for enforcement of the warranty of habitability that lumps loft tenants in a category different from that of all *746 other residential tenants would be a direct contravention of the statute”, the court agrees with the foregoing dicta. This case clearly illustrates not only a need for different criteria in loft cases, but even further, different rules depending on the nature of the space rented. Here, where raw space was leased, the factors to be considered in determining whether to grant an abatement are different from those where a loft was rented with residential appurtenances. If a toilet installed by the tenant doesn’t work (assuming the fault not due to the plumbing outside the unit), there would be no reason for an abatement, while the opposite would be true if the premises were rented with such facility. (See Lomreal Realty Corp. v Deutschman, NYLJ, Feb. 9, 1981, p 12, col 5 [App Term, 1st Dept].)
In section 282 of the Multiple Dwelling Law, one of the tasks delegated to the Board is to issue “rules and regulations governing minimum housing maintenance standards”. In this connection the Board, on January 27, 1983, adopted section 3 of its rules which in substance requires an owner to provide the housing maintenance services specified therein or in the last lease, whichever is greater with respect to any particular service.
The major complaint of the tenants, especially those on the fourth floor, was of water leaks after a rainstorm. The landlord acknowledged such problem but claimed that after a new roof was installed in the summer of 1980 no complaints of leaks were received. Since so much of the testimony related to the existence or nonexistence of these leaks, the court, after the conclusion of testimony on a day when there had been a torrential downpour, suggested that both parties visit the lofts to ascertain the situation. Although both parties agreed to a joint inspection, the tenants did not appear at the building, allegedly because of a misunderstanding between attorneys (which assertion the court does not believe). The testimony of the petitioners who went to the building that evening was that the stairways and hallways (about which many photographs were offered by respondents with respect to their wetness after a rainstorm) were dry. This was substantially confirmed by one of the respondents who was not in court that day. Regrettably no examination of the interior of the units was *747 made that night, respondents being well within their rights in rejecting a court visitation without a stenographer being present at the time, a suggestion by petitioners that the court’s observations be spread on the record the next day having been rejected by respondents.
Initially the court observes that the complaints about the lack of mailboxes, bell and buzzer system, and exterminating services, not being required by the lease or the Board rules, are not items for which an abatement should be given.
The court does believe that there were problems with leaks, which much more severely affected the tenants of the fourth floor than the tenants of the second floor. Although, as indicated above, loft tenants are subject to different standards from tenants of conventional housing, they nevertheless are entitled to be free from having water leak into their units and are entitled to a warranty of habitability abatement therefor. (See Gold v Howard, NYLJ, Dec. 9, 1980, p 10, col 5 [App Term, 1st Dept]; McGuinness v Jakubiak, 106 Misc 2d 317.)
From all of the testimony the court concludes that the tenants of the fourth floor are entitled to a 15% abatement, while the tenants of the second floor are entitled to a 5% abatement. Claims under the warranty, other than those relating to the leaks, are not such as to justify a higher abatement.
COMMERCIAL OCCUPANCY
Since the warranty is not applicable to premises occupied for commercial purposes (Bomze v Jaybee Photo Suppliers, 117 Misc 2d 957 [App Term, 1st Dept]; 230 Park Ave. Assoc. v Term Inds., NYLJ, Feb. 11, 1982, p 6, col 3 [App Term, 1st Dept]), the court must determine the effect of the commercial use of the premises of the second floor. The front half of that space was from time to time used as a theatre and was rented for use as a studio for the teaching of acting, pantomime and ballet. Although the tenants may have had use of that space when not otherwise used by others, it cannot be said that it was ever occupied for residential purposes, being partitioned from the residential portion.
*748 The court thus concludes that only half of the second floor was used for residential purposes and that 50% of the rental is applicable to such portion. Since the nonresidential space is clearly separable from that used for residential purposes the abatement for this floor shall only be applicable to one half of the rent payable by the tenants thereof. That the occupants may have on their tax returns indicated that 75% of the rental payments were for space used for business purposes does not alter the court’s conclusion from all of the testimony as to actual use. In any event, even if a portion of the residential area was at times used for business purposes, such portion was not separate so as to further reduce the amount of the abatement.
In contrast, the fourth floor, which admittedly is sparsely furnished, is not commercially used. Although Mr. Aronson indicated that he paints a great deal, painting is not his occupation (having only sold one painting in his lifetime), he being a full-time carpenter who performs his work at his customers’ premises. His wife, Diane Talon, has her own studio.
Accordingly, the warranty abatement is applicable to the full rental. Any incidental commercial use (such as occasionally making frames) in an area not separable from the residential space, should not lessen the amount of the abatement.
LOFT BOARD RENT INCREASE
On the issue of the rent increase payable as of July 1, 1983, respondents are correct in asserting that the increase should only be 22%. Board order No. 1 provides for a 4% surcharge above the 22% increase if the lease “does not contain any escalator provisions”. Here the leases do provide for escalations based on real estate tax increases. The fact that petitioners have not sought to collect same in this trial does not alter the fact that the clause exists. The Board rule does not contemplate the increase being 4% or the amount provided in the lease, whichever is greater. If the escalator provision is contained in the lease, there is no authorization for an additional 4% surcharge.
Accordingly, the monthly increase for tenants on the second floor should be $77 rather than $91 as claimed by *749 landlord, and for the tenants of the fourth floor the increase should be $69.30 per month rather than $81.90.
INTEREST
Petitioners have, as provided in CPLR 5001, requested interest on the unpaid amount. Because interest accrued at various dates, under subdivision (b) of said section interest is to be calculated at a “single reasonable intermediate date”. The intermediate date for rent owing from April, 1980 to February, 1984 is March 1, 1982.
CONCLUSION
In summary, respondents Kounitz and Klein are indebted to petitioners for a monthly rental of $350 from April, 1980 to June, 1983, and $427 from July, 1983 to February, 1984, for a total of $17,066, less a 5% abatement on one half of said amount equaling $426.65, for a total of $16,639.35, plus interest of $3,161.47, for a grand total of $19,800.82. The respondents Aronson and Talon owe petitioners $315 per month from April, 1980 to June, 1983 and $384.30 per month from July, 1983 to February, 1984, for a total of $15,359.40, less a 15% abatement equaling $2,303.91, for a total of $13,055.49, plus interest of $2,918.28, for a grand total of $15,973.77.
Issuance of the warrants and execution on the judgments is to be stayed for a period of 20 days from the date hereof. If the full amount of the judgment is paid prior to the issuance of the warrant, the warrant is permanently stayed.
The counterclaims are dismissed for lack of proof.
Under the circumstances, attorneys’ fees will not be awarded to any party.