**WALLACE STEEL, INC.,
Plaintiff-Appellant-Cross-Appellee,**

v.

**INGERSOLL–RAND COMPANY,
Defendant-Appellee-Cross-Appellant.**

Cal. Nos. 961, 1051, Dockets
83–7975, 83–9019.

United States Court of Appeals,
Second Circuit.

Argued April 5, 1984.

Decided July 19, 1984.

Stuart A. Jackson, New York City (John A. Harras, New York City, of counsel), for plaintiff-appellant-cross-appellee.

Jay W. Wason, Syracuse, N.Y. (Mackenzie, Smith, Lewis, Michell & Hughes and Arthur W. Wentlandt, Syracuse, N.Y., of counsel), for defendant-appellee-cross-appellant.

Before TIMBERS, VAN GRAAFEILAND and CARDAMONE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is an appeal and cross-appeal from an order and judgment of the United States District Court for the Northern District of New York (Munson, C.J.). The district court, after a jury trial and verdict in favor of plaintiff, Wallace Steel, Inc. (Wallace), partially granted Ingersoll-Rand Co.'s (Ingersoll) prior motion for a directed verdict and reduced the jury's award by $762,921.

Judgment was entered on the modified award. We reverse the order and judgment of the district court, and remand with instructions to reinstate the verdict as rendered and enter judgment accordingly. *See H.C. Blackwell Co. v. Kenworth Truck Co.*, 620 F.2d 104, 107 (5th Cir.1980).

Wallace is engaged in the business of buying, processing and selling ferrous and non-ferrous scrap metal. Ingersoll manufactures large gas compressors and other products which are cast in part from melted steel and iron. Ingersoll has been a customer of Wallace for many years and often purchased steel scrap from Wallace for use in its foundry operations.

On September 9, 1974, Wallace and Ingersoll entered into a written contract pursuant to which Wallace was to supply Ingersoll with crushed motor block for the latter's foundry. The contract is in the form of a written proposal by Wallace to "sell and deliver" to Ingersoll steel scrap (the "Processed Material") recovered from dirty motor blocks (the "Raw Material") through a process of breaking, cleaning, sorting, and drying. The Processed Material was to be sold by Wallace and purchased by Ingersoll in specified monthly amounts for a period of five years. Any amount of Processed Material not ordered by Ingersoll in any month, or which exceeded the total monthly amount Ingersoll was permitted to order under the contract, could be sold by Wallace "for its own account" to others.

Wallace was to purchase the Raw Material at prices to be approved by Ingersoll, which approval was not to be unreasonably withheld. Wallace was also to attempt to maintain a sufficient inventory of Raw Material to fill Ingersoll's specified monthly requirements. Wallace warranted that the Processed Material would be suitable for appropriate foundry melting, and Ingersoll could refuse to accept any Processed Material that did not conform to the warranty. The "Purchase Price" to be paid by Ingersoll per gross ton of Processed Material was determined by a formula which used Wallace's cost for Raw Material as a base and added $32 for processing. The total of these two figures was then increased 15% to allow for weight loss and 10% for profit. The end result of these computations was Ingersoll's "Purchase Price".

The contract also provided that, if market conditions were such that it would be to Ingersoll's advantage to purchase Raw Material in excess of Wallace's requirements for normal production, Ingersoll might purchase excess Raw Material and store it at Wallace's plant subject to Wallace's approval, which would not be unreasonably withheld. The purchase price for the Processed Material from Raw Material purchased by Ingersoll was to be computed according to the above-described formula, except that Ingersoll's cost was to be used as the base and thereafter was to be deducted from the formulated purchase price.

The Raw Material which Wallace purchased did not consist solely of steel scrap suitable for smelting. Some of the steel in the Raw Material was in alloy form not suitable for foundry melting. Also, attached to the motor blocks were such things as carburetors, fuel pumps, starters, generators, torque converters, and motor mounts which contained materials such as zinc, copper, aluminum and rubber. These materials had a value separate and apart from the Processed Material which Ingersoll had agreed to purchase and were thus a valuable byproduct of the purchase agreement. Indeed, 70% of Wallace's profit under the contract came from these byproducts, and only 30% came from the sale of Processed Material to Ingersoll.

In recognition of the fact that Wallace's cost projection was based in part upon an estimated recovery of sixty-six pounds of aluminum per gross ton of Raw Material, the contract provided that any net money Wallace received for aluminum in excess of sixty-six pounds per ton should be remitted to Ingersoll. No similar provision was made with respect to the other byproducts.

The issue on appeal is whether, upon Ingersoll's concededly wrongful termination of the contract thirty-two months prior to its expiration date, Wallace was entitled

to recover damages, not only for the 10% loss of profits incorporated in the Purchase Price formula, but also for the loss of the sixty-six pounds per ton of aluminum and the other valuable byproducts. By means of a special verdict, the jury resolved this issue in favor of Wallace. To the extent that the verdict included an award for the loss of byproducts other than aluminum, the district court disagreed. The $762,921 reduction in the jury verdict was the result of this disagreement. Ingersoll contends that this reduction was justified under the parol evidence rule and the consequential damage rule of the Uniform Commercial Code, § 1–106(1). It also contends that the amount of the reduction should have been increased to include the amount awarded for the loss of aluminum byproducts. We find no merit in these contentions.

■ The parol evidence rule provides in substance that, where the parties have reduced their agreement to writing, evidence of prior or contemporaneous agreements may not be offered to contradict, vary, or subtract from the terms of the writing. *See Aratari v. Chrysler Corp.*, 35 A.D.2d 1077, 316 N.Y.S.2d 680 (1970); *Restatement (Second) of Contracts* § 213 (1981). That rule was not violated in this case.

■ Under the express terms of the contract, Wallace was required to purchase enough Raw Material so that it could satisfy Ingersoll's normal requirements for Processed Material. A "purchase" includes taking by "sale ... or any other voluntary transaction creating an interest in property." U.C.C. § 1–201(32). That portion of the Raw Material which was converted into Processed Material was to be sold to Ingersoll with appropriate warranties, and could be rejected by Ingersoll if it was not as warranted. "A 'sale' consists in the passing of title from the seller to the buyer for a price." U.C.C. § 2–106(1); *see DeSimon v. Ogden Associates*, 88 A.D.2d 472, 478, 454 N.Y.S.2d 721 (1982). Such oral testimony as the district court permitted to be introduced did not vary the terms of the contract. It merely confirmed the clear import of the written language, *i.e.*, that

portion of the Raw Material which was purchased by Wallace and not sold to Ingersoll remained the property of Wallace.

■ In fixing damages for breach of contract, the intent is to put the plaintiff in as good a position as he would have been in had the defendant abided by his agreement, *New York Water Service Corp. v. City of New York*, 4 A.D.2d 209, 213, 163 N.Y.S.2d 538 (1957) (citing 5 *Williston on Contracts [rev. ed.]* § 1338, now 11 Jaeger, *Williston on Contracts* § 1338 (1968)), *i.e.*, to award plaintiff the value to him of the defendant's performance, *Hollwedel v. Duffy-Mott Co.*, 238 A.D. 468, 470, 264 N.Y.S. 745, *rev'd on other grounds*, 263 N.Y. 95, 31 N.Y.S.2d 584 (1933). Had Ingersoll performed its contract as agreed, Wallace would have continued to retain the byproducts from its processing of Raw Material for the balance of the five-year period. Having been deprived of this by-product by Ingersoll's breach, Wallace was entitled to recover the reasonable value of what it had lost. "The Uniform Commercial Code allows the seller actual damages where liquidated damages have not been stipulated ...." *Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp.*, 16 N.Y.2d 344, 354, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965); *see Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 397–40, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972).

■ The value of personal property may be proved by showing its market value. *Richardson on Evidence*, § 188, at 161 (10th ed. 1973); 2 *Wigmore on Evidence* § 463 (Chadbourn rev. 1979). Proof of the value of the by-products in this manner did not unlawfully enlarge the damage picture by encompassing within its framework unrelated and unanticipated transactions with third parties. "For evidential purposes, sale value is nothing more than the nature or quality of the article as measured by the money which others show themselves willing to lay out in purchasing it." *Id.*

In determining the amount of Wallace's damages, it was, of course, necessary for the jury to decide how many tons of Processed Material Ingersoll would have been required to purchase during the thirty-two months following Ingersoll's breach of the contract. Under the basic terms of the contract, Ingersoll was obligated to purchase at least 1,300 tons per month. Although, an addendum to the contract provided that Ingersoll could reduce its purchases to 650 tons per month if its production requirements were reduced as the result of reduced consumer demand for Ingersoll's products, Ingersoll offered no proof of such reduced demand during the thirty-two month period. Indeed, it offered no evidence of any kind. Under the circumstances, the jury quite properly computed Wallace's damages on the basis of monthly purchases of 1,300 tons, and there is no merit in Ingersoll's cross-appeal on this issue.

The order and judgment of the district court are reversed. The case is remanded with instructions to reinstate the verdict as rendered and to enter appropriate judgment, with interest thereon to be computed as of the date of the original judgment.