**ROGERSON AIRCRAFT CORPORATION,**
Plaintiff,

v.

**FAIRCHILD INDUSTRIES, INC., Defendant.**

**No. CV 83–6124–AAH (TX).**

United States District Court, C.D. California.

April 17, 1986.

McKenna, Conner & Cuneo, Los Angeles, Cal. by James J. Gallagher and Richard B. Oliver, for plaintiff.

Pettit & Martin, Los Angeles, Cal. by Thomas C. Wheeler and James D. Warren, for defendant.

## MEMORANDUM OF DECISION AND ORDER OF JUDGMENT FOR PLAINTIFF

HAUK, Senior District Judge.

### I. PRELIMINARY STATEMENT

This matter is an action for damages brought by Rogerson Aircraft Corporation (Rogerson), a California corporation with its principal place of business in Irvine, California, against Fairchild Industries, Inc. (Fairchild), a Maryland corporation with its principal place of business in Germantown, Maryland, charging that a putative termination for default of an aircraft parts manufacturing contract for engine de-icing equipment between Rogerson as supplier and Fairchild as buyer was improper and therefore constituted a breach of contract. Federal jurisdiction is founded on diversity of citizenship, 28 U.S.C. § 1332 (1985).

On or about January 25, 1980, Fairchild and Saab-Scania AB (Saab), a Swedish manufacturing company, entered into a joint venture agreement to develop, manufacture and market a passenger aircraft known as the SF–340.[1] As part of its joint venture undertaking, Fairchild entered into an agreement with Rogerson on August 7, 1981 (August 7 Agreement) under which Rogerson was to supply certain SF–340 equipment unrelated to this action.

In November, 1981, pursuant to a Fairchild Request for Proposals for the manufacture of the component parts central to the present litigation, an engine de-icing duct and controller system for the SF–340,[2]

---

1. Saab was not named as a defendant in this action.

2. The duct is the component on the SF–340 that allows air to flow through the wing engines for cooling purposes. It is designed to prevent the

Rogerson submitted a proposal for the manufacture of a Kevlar duct, a substance on the cutting edge of aircraft manufacturing technology. Fairchild accepted Rogerson's proposal, and on January 14, 1982 issued a purchase order authorizing Rogerson to begin production on three test units, four prototype units, and 24 units of production equipment. The unit prices for the production equipment were set at $9,960 per duct and $300 per controller. On November 12, 1982, Rogerson and Fairchild executed an amendment to the August 7, 1981 Agreement providing that the production of the duct and controller system would be under the terms of the Agreement.

Although the production of the duct and controller system was plagued with technical and design problems from the start, Fairchild nevertheless issued a second purchase order on January 28, 1983 instructing Rogerson to manufacture 34 additional shipsets of ducts and controllers for delivery in October, 1983. However, due to Rogerson's continuing difficulty in producing a workable system from the specifications and models supplied by Fairchild, and problems with the controller's performance in a February 1983 icing tunnel test, Fairchild issued an order on May 26, 1983 instructing Rogerson to stop all work under the original purchase orders. In early June, 1983, Fairchild issued Rogerson a new purchase order calling for the fabrication of a second test article for a second icing tunnel test, to be delivered to Fairchild on August 15, 1983.

Subsequent to the February 1983 icing tunnel test, Fairchild began exploring alternative designs and alternative producers for the duct and controller system. However, contrary to aircraft industry custom, Fairchild did not inform Rogerson that it was looking for an alternative supplier for the ducts and controllers. From April, 1983 to June, 1983, again without advising Rogerson, Fairchild solicited alternative design proposals from several aircraft industry contractors including Lucas Aerospace, an English manufacturer.

On July 7, 1983, the Fairchild executive committee responsible for overseeing the contracts of Fairchild's suppliers held a special meeting to discuss the SF–340 duct and controller program. At this meeting, the committee decided to award Lucas Aerospace a de-icing duct and controller development contract with production options on terms more favorable to Fairchild than its contract with Rogerson. The committee also decided to terminate the Rogerson duct and controller contract for default, even though the test article under the June, 1983 purchase order was not due to be delivered until August 15, 1983 and the contract was therefore not in default. Subsequent to the July 7 meeting, Fairchild did not immediately inform Rogerson of its intent to terminate the Rogerson contract or its awarding of a contract to Lucas. Fairchild also did not advise Rogerson to stop work on the test articles under the June, 1983 purchase order.

Rogerson first learned that Fairchild was terminating the SF–340 duct and controller contract for default, with no liability to Fairchild, at a meeting between Fairchild and Rogerson personnel on July 21, 1983. At this meeting, Michael Rogerson, the president of Rogerson, was bluntly told that the contract was being terminated for default, and the Fairchild principals who delivered the information then intentionally left the room without further discussion. On July 22, 1983, Fairchild gave Rogerson formal written notice of the termination for default.

Rogerson instituted the present action for breach of contract on September 23, 1983. Fairchild initially responded by denying its termination for default was improper and asserting a counterclaim for breach of contract against Rogerson. However, on December 27, 1984, more than

---

build-up of ice so that the flow of air is not blocked. Electric heater blankets are embedded in the surface of the duct to melt any built-up ice. The controller regulates the amount of electricity supplied to the heater blankets.

There are two duct and controller units on each SF–340 aircraft, one duct and one controller for each engine. A set of two ducts and two controllers is referred to as a "shipset."

one year after this action was filed, Fairchild withdrew its counterclaim and filed an amended answer asserting that the correct basis for its termination of the duct and controller contract was a termination for convenience provision contained in the August 7 Agreement. Fairchild has thus implicitly admitted that its termination of the duct and controller contract for default was improper.

Now, after a waiver of jury trial by the parties and a full court trial, lasting 11 days, on the issues of liability and damages, and after full consideration of the law and evidence and the arguments presented by both parties, the Court hereby renders its decision and order for judgment, which shall constitute findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. FAIRCHILD'S LIABILITY FOR BREACH OF CONTRACT

The threshhold issue to be decided in this action is whether Fairchild's improper termination of the duct and controller contract "for default" constituted a breach of contract which entitles Rogerson to damages under New York law,[3] or whether Fairchild's contractual right to terminate the contract at will pursuant to the termination "for convenience" provision of the August

3. Article 21.1 of the August 7 Agreement between Rogerson and Fairchild provides that the contract is to be interpreted in accordance with New York law.

4. The reference in Article 9.7 to DAR 8–706 refers to Defense Acquisition Regulation 8–706, 32 C.F.R. Pt. II, at 821–23 (1984), a suggested standard termination clause for use in fixed-price government subcontracts. Under DAR 8–706, a buyer may terminate work on a subcontract at any time for any reason by delivering to the seller a Notice of Termination specifying the effective date of the termination and the extent to which work under the subcontract is to be terminated. DAR 8–706(a), 32 C.F.R. Pt. II, at 821 (1984). Upon receipt of the Notice of Termination, the seller is to stop work on and close out the subcontract, and may, within six months of receipt of the Notice, submit a termination claim for money due under the subcontract.

7 Agreement limits Rogerson's recovery to those actual amounts specified in the "termination for convenience" provision.

Article 9 of the August 7 Agreement governs termination of the duct and controller contract. Article 9.4, the *termination for default* provision, provides:

> If SELLER fails to delivery [sic] any EQUIPMENT in accordance with the agreed upon delivery schedule ... and such failure continues for a period of 90 (ninety) days, then BUYER shall have the right to terminate for default this AGREEMENT and/or any ORDERS for EQUIPMENT placed hereunder, in whole or in part, upon written notice to SELLER and shall retain all rights and remedies at law or in equity against SELLER....

Article 9.7 of the Agreement, the so-called *termination for convenience* provision, provides:

> In the event that any ORDER issued hereunder is terminated by BUYER for reasons other than stated in paragraphs 9.3 and 9.4, SELLER shall retain all right with respect to claims resulting from said termination in accordance with DAR 8–706 which is incorporated herein by reference.[4]

Fairchild argues that the manner of its termination of the duct and controller contract is not relevant to the question of damages in this case, since Rogerson can

DAR 8–706(b, c), 32 C.F.R. Pt. II, at 821–22 (1984). Pursuant to DAR 8–706, a seller is entitled to receive from the buyer payment for completed work not theretofore paid for, the costs of settling and paying claims arising out of the termination, a reasonable and fair profit on the completed work as provided in Armed Services Procurement Regulation 8–303, 32 C.F.R. Pt. II, at 803–04 (1984), and other reasonable costs of settlement, including accounting, legal, clerical and other expenses, and the costs of transportation and storage of property related to the terminated contract. DAR 8–706(e), 32 C.F.R. Pt. II, at 822–23 (1984).

The Armed Services Procurement Regulations and the Defense Acquisition Regulations have been superseded by the Federal Acquisition Regulations (FAR), effective April 1, 1984. *See* 1 Gov't Cont.Rept. (CCH) ¶ 250, at 1075 (April 12, 1984). However, private contractors are still free to adopt the superseded regulations.

acquire no greater rights under the contract by alleging breach than it would have if Fairchild had terminated the contract under the termination for convenience provision of the August 7 Agreement, and in any event the termination for convenience provision provided an adequate ground for termination which can be used to cure the improper termination for default. According to Fairchild, since Article 9.7 permitted it to terminate the duct and controller contract at any time for any reason in accordance with Defense Acquisition Regulation (DAR) 8–706, 32 C.F.R. Pt. II, at 821–23 (1984), Rogerson is barred from recovering anticipatory profits and other breach of contract damages as a result of Fairchild's improper termination for default, but may only recover its actual out-of-pocket costs and settlement expenses as provided in DAR 8–706 plus a reasonable profit on its completed work as provided in Armed Services Procurement Regulation (ASPR) 8–303, 32 C.F.R. Pt. II, at 803–04 (1984).

■ Fairchild's position is untenable in light of the literal terms of the termination provisions of the August 7 Agreement. It is fundamental that where the parties to a contract have agreed to termination provisions for that contract, those provisions are binding upon the parties and must be enforced as written. *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 652, 192 N.Y.S.2d 380, 385 (N.Y.Sup.Ct.1959). In the present case, a reading of Article 9.7 in connection with Article 9.4 compels the conclusion that Fairchild cannot rely on Article 9.7 to cure its improper termination for default and limit its liability for damages. The language of Article 9.7 expressly provides that the clause is applicable only when the termination of the contract is for a reason *other than default.* In effect, the termination provisions of the August 7 Agreement were structured to force Fairchild to elect either to terminate the duct and controller contract for its convenience under Article 9.7, thereby requiring a speedy close-out of the contract and the payment of Rogerson's termination costs and settlement expenses as provided in DAR 8–706, or to terminate the contract for default under Article 9.4 without having to pay a

termination settlement. Having chosen to avail itself of default termination under Article 9.4 and avoid the payment to Rogerson of what would have been a substantial termination settlement, Fairchild cannot now reverse that decision and avoid liability for breach of contract damages for its groundless default termination by alleging that it should have terminated the duct and controller contract for its convenience and paid Rogerson's termination and settlement costs at the time of termination.

This case is virtually on point with *Klein v. United States*, 285 F.2d 778, 152 Ct.Cl. 8 (1961), the leading case holding that the wrongful termination of a contract for default constitutes a breach of contract regardless of the existence of a termination for convenience provision in the contract. In *Klein,* the contract in question contained both a default termination clause and a clause which allowed the government to terminate the contract if termination was in the best interest of the government. The government initially terminated the plaintiff's contract for an alleged default. However, one and one-half years later, subsequent to a finding by the Armed Services Board of Contract Appeals that there had been no default by the plaintiff, the government asserted that the correct ground for the termination of the contract was the termination for convenience provision. The Court of Claims rejected the government's position and concluded that the government, having wrongfully terminated the contract, could not retroactively give that wrongful termination a different legal effect by changing the label which had been expressly and purposely attached to it, where the only purpose of the change in label was to attempt to diminish the damages recoverable by the plaintiff. 285 F.2d at 783–85. Similarly, in *Goldwasser v. United States*, 325 F.2d 722, 163 Ct.Cl. 450 (1963), the government terminated the plaintiff's contract for default even though the plaintiff's performance under the contract had been acceptable. Subsequently, the government sought to avoid breach of contract damages by citing a termination for convenience clause in the contract as

the proper ground for termination. The Court of Claims, relying on *Klein,* held that since the original basis of the government's termination was the plaintiff's default, and the plaintiff was not in default, the contract had been breached by the government and the plaintiff was entitled to full breach of contract damages and not merely a convenience termination settlement. 325 F.2d at 725. *Accord: Dynalectron Corp. (Pacific Div.) v. United States,* 518 F.2d 594, 604, 207 Ct.Cl. 349 (1975) (a wrongful termination for default is a breach of contract absent some contractual provision to the contrary); *Nesbitt v. United States,* 345 F.2d 583, 585 n. 2, 170 Ct.Cl. 666 (1965).[5]

Fairchild relies primarily on *College Point Boat Corp. v. United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925), *John Reiner & Co. v. United States,* 325 F.2d 438, 163 Ct.Cl. 381 (1963) and *Chatham Plan, Inc. v. Clinton Trust Co.,* 246 A.D. 498, 286 N.Y.S. 179 (N.Y.App.Div. 1936) to support its position that it can only be liable for the damages specified in the termination for convenience provision and DAR 8–706. Fairchild's reliance on these cases is misplaced. Both *College Point* and *Reiner* involved situations where the government terminated a contract for a reason other than default, which proved to be unsupportable, but where an otherwise valid reason for termination existed which was used to cure the mistaken termination. Neither case purported to hold that a wrongful termination for default is anything other than a breach of contract or that the existence of a termination for convenience clause in a contract can be used to limit damages or cure a wrongful termination for default. In fact, the *Reiner* court expressly accepted the *Klein* rule that once a party wrongfully terminates a contract for default, it cannot thereafter avoid breach of contract liability by invoking a termination for convenience clause. *See* 325 F.2d at 444. Likewise, the *Chatham Plan* case did not involve a wrongful termination for default, but rather a proper termination for convenience in accordance with the express terms of the contract. *See* 246 A.D. at 499, 286 N.Y.S. at 181.

In the present case, it is clear that the sole reason that Fairchild has invoked the termination for convenience clause as the proper ground for its termination of the duct and controller contract is to limit the damages recoverable by Rogerson. In light of the literal terms of the termination provisions of the August 7 Agreement and the reasoning of *Klein* and its progeny, the Court finds that Fairchild cannot invoke the termination for convenience provision to cure its improper default termination and accordingly concludes that Fairchild's wrongful termination for default constituted a breach of the duct and controller contract entitling Rogerson to recover damages as provided by New York law. To hold otherwise would inequitably allow a party terminating a contract containing both a default termination clause and a convenience termination clause to avoid the immediate payment of a termination settlement by terminating the contract for default without the grounds to do so, thereby obtaining substantial leverage for subsequent settlement negotiations, knowing that in subsequent litigation the maximum liability faced will be the limited amounts set forth in the convenience termination provision.

**B. CALCULATION OF ROGERSON'S DAMAGES**

Having decided that Fairchild is liable to Rogerson for damages for breach of contract, the amount of damages to be awarded to Rogerson must now be determined.

---

**5.** It is interesting to note that because of the impact of *Klein* and its progeny, since 1970 the government has used as a standard clause in all government subcontracts a provision which automatically converts a mistaken termination for default into a valid termination for convenience. *See* 48 C.F.R. § 49.401(b) (1985); 48 C.F.R. § 52.249(g) (1985). *See also* 2 Gov't Cont.Rept. ¶ 13,240, at 7659–60 (August 22, 1985). Since the August 7 Agreement between Rogerson and Fairchild failed to utilize such an "automatic conversion clause" or to otherwise provide that an improper termination for default would become a proper termination for convenience, the *Klein* rule is fully applicable to the present case.

Rogerson claims that it is entitled to be compensated for the following seven elements of damage: (1) lost profits from sales of original equipment; (2) lost profits from the sales of spare parts; (3) loss of contracts with third parties unrelated to this litigation; (4) unreimbursed overhead; (5) incidental damages; (6) pre- and post-judgment interest; and (7) attorneys fees. Each of these claims will be addressed in turn below.

1. *Lost profits from prospective original equipment sales.*

Under New York law, a seller may recover lost anticipatory profits as an element of damages in a breach of contract action, so long (1) as these profits were contemplated by the parties when they entered the contract, (2) the loss of prospective profits is the direct and proximate result of the breach, and (3) there is a rational basis from which to calculate the lost profits. N.Y.U.C.C. § 2–708(2) (McKinney 1964); *Perma Research & Development Co. v. Singer Co.,* 402 F.Supp. 881, 889 (S.D.N.Y. 1975), *aff'd,* 542 F.2d 111 (2d Cir.1976).[6] In the instant case, it is clear beyond doubt that Fairchild and Rogerson contemplated and anticipated that Rogerson would earn profits on the duct and controller contract, and that Fairchild's breach of that contract was the direct and proximate cause of Rogerson's loss of such profits. However, Fairchild argues that Rogerson's claim for anticipatory profits must be rejected as being speculative and uncertain because the duct and controller contract was terminable at will and because Rogerson's Composites Division, which was responsible for the production of the duct, was a new venture without a proven record of production.

■ Fairchild's argument is without merit and misconstrues the focus of the Court's inquiry in evaluating a claim for lost profits. A plaintiff is entitled to an award of anticipatory profits as damages for a breach of contract regardless of the newness of its business or the possible future termination of the contract where the terms of the contract and the circumstances surrounding its performance and breach provide a sufficiently certain basis for the calculation of lost profits. *See Perma Research, supra,* at 899; *For Children, Inc. v. Graphics International, Inc.,* 352 F.Supp. 1280, 1284–85 (S.D.N.Y.1972). This is especially true in light of the oft-repeated rule that where a defendant renders the determination of damages difficult by its breach, it must bear the risk of uncertainty created by its own conduct. *See Perma Research, supra,* at 899.

■ In the present case, there is more than sufficient evidence upon which to calculate an award of anticipatory profits with certainty. Detailed evidence was introduced at trial as to the actual cost per unit to manufacture the ducts and controllers, and Rogerson's historical profit margin on the aircraft parts contracts of its other divisions. Additionally, Fairchild's continued involvement with the SF–340 program subsequent to its breach of the duct and controller contract provides a basis for measuring Rogerson's expected sales of ducts and controllers had Fairchild not breached. In sum, the Court finds that a reasonable basis exists for calculating Rogerson's lost profits with certainty as required under New York law, and Rogerson is thus entitled to lost prospective profits

---

6. N.Y.U.C.C. § 2–708 provides in full:

**§ 2–708. Seller's Damages for Non-acceptance or Repudiation**

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

as damages for Fairchild's breach. Rogerson's lost profits on original equipment sales will be calculated by allowing Rogerson a reasonable percentage of profit on the gross revenues Rogerson would have earned under the contract.

A determination of Rogerson's expected gross revenues on original equipment sales under the duct and controller contract first requires a projection of the number of duct and controller units Rogerson could have reasonably expected to sell absent Fairchild's breach. Rogerson argues that it reasonably could have expected to sell 400 units, since the contract expressly provided for the production of 200 shipsets of ducts and controllers for Fairchild, each shipset consisting of two units. Conversely, Fairchild contends that it would have purchased no more than 216 units from Rogerson, since its direct involvement with the SF–340 program ended after the delivery of the 108th aircraft.

In entering into the duct and controller contract with Fairchild, Rogerson should have expected to supply ducts and controllers for the SF–340 only for so long as Fairchild remained involved in the production of the aircraft. Thus, Fairchild is at least conceptually correct in its position on Rogerson's expected sales. However, the figures it argues are at variance with the evidence presented at trial. Testimonial and documentary facts were presented which established that Fairchild will be involved with the production of the SF–340, either directly or by supplying component parts, through the delivery of the 158th aircraft, after which Saab will assume exclusive control of production. In light of such evidence, the Court concludes that Rogerson's prospective sales of original equipment ducts and controllers were 158 shipsets, or 316 units.

The parties vigorously contest the price per unit that should be used to calculate Rogerson's gross revenues. Although the original contract called for a price of $9,960 per duct and $300 per controller, Rogerson argues that Fairchild's original system design upon which such prices were based was seriously flawed, which resulted in unworkable prototypes and substantial design

changes. Rogerson contends that the increased materials and labor costs occasioned by such design changes would have caused it to charge $15,500 per duct and $1,800 per controller had the contract not been breached. Fairchild disputes the validity of many of Rogerson's individual change claims, contending that any increased cost per unit above $11,390 per duct and $300 per controller was the result of Rogerson's carelessness in originally pricing the contract and producing the ducts and controllers, not the result of Fairchild's changes in the design of the system.

■ The Court agrees with Rogerson's position regarding design changes and concommitant cost increases in the duct and controller system. Article 8.3 of the August 7 Agreement specifically contemplates that fair and reasonable adjustments in price shall be made if any change in the contract causes a cost increase. The Court finds Rogerson's cost assertion of $15,500 per duct and $1,800 per controller both fair and reasonable. Substantial credible evidence was presented at trial which demonstrated that Fairchild's initial design specifications were at best preliminary and therefore not suitable for accurate pricing of the per unit duct and controller cost. As detailed in the testimony of Michael Rogerson and several Rogerson engineers and employees, from the outset of the contract Rogerson was forced to exert extraordinary effort in working with Fairchild's models and designs, but continued to have difficulty in producing a workable duct from the specifications provided by Fairchild. The problems ultimately required Rogerson to use its own engineering expertise to modify the design specifications in order to produce a workable duct. In addition, evidence was presented which showed that, independent of the changes made by Rogerson, Fairchild ordered approximately 25 separate changes to the duct design, thereby substantially increasing labor and materials costs. Likewise, Rogerson was never able to produce a workable controller from the design provided by Fairchild. As a result, Rogerson had to abandon Fair-

child's "one-box" controller and independently design a higher wattage "two-box" controller, again with resulting increased labor and materials costs.

The overwhelming weight of the evidence presented at trial establishes that Rogerson is justified in asserting a per unit price of $15,500 per duct and $1,800 per controller. Rogerson's gross revenues will thus be calculated based on these per unit prices.

■ Having determined that Rogerson's gross revenues will be calculated based on expected sales of 316 duct and controller units at $18,300 per unit, it remains to be determined what profit margin to allow Rogerson on such gross revenues. The Court is of the opinion that Rogerson's historical earnings on its aircraft supply contracts is the best indicator of the amount of profit that Rogerson would have earned from the duct and controller contract. Testimony regarding Rogerson's earnings in the fiscal years 1983 and 1984 established that Rogerson earned roughly 15% of gross revenues as profit in those years. The Court will therefore utilize a 15% profit margin in the calculation of Rogerson's lost profits.

Based on the foregoing discussion, Rogerson is entitled to receive $820,020.00 as damages for lost profits from original equipment sales, which constitute a 15% profit on anticipatory gross revenues of $5,466,800.00 from the duct and controller contract.

2. *Lost profits from prospective spare parts sales.*

It was established at trial that there is a substantial and highly profitable aftermarket for spare parts in the aircraft industry. In this aftermarket, parts suppliers and manufacturers typically sell spare parts to aircraft owners at prices marked up to almost six times their original cost. To show the profitability of this aftermarket, Michael Rogerson testified that approximately one-third of his company's profits come from the sale of spare parts.

■ Since industry custom and usage of trade are implied terms in all sales contracts, N.Y.U.C.C. § 1–205 (McKinney 1964), Fairchild must be found to have contemplated that Rogerson would have earned substantial profits from the sale of spare ducts and controllers when it entered into the duct and controller contract, and Rogerson is therefore entitled to recover as damages the profits it reasonably could have expected to earn from the sale of spare parts had the contract not been breached. The amount to be awarded will be calculated using the same methodology used to calculate Rogerson's lost profits from original equipment sales, *supra.*

■ Rogerson's historical experience in the spare parts aftermarket and industry-wide trends in the sale of spare parts are the most reliable bases for projecting Rogerson's reasonably expected gross revenues from the sale of spares. Evidence was presented demonstrating that in the aircraft industry, parts suppliers and manufacturers usually sell as spare parts an additional 15% to 20% of the amount of parts sold as original equipment. In Rogerson's case, such spare parts are usually sold at prices of up to five times the original equipment price. Rogerson's experience with spare parts for the SF–340 unrelated to this action is particularly relevant in this regard. At the time of trial, Rogerson was selling SF–340 spare parts such as distributor valves, fuel sensors and dipsticks at prices ranging from 3.8 to 5.4 times the original equipment price.

In light of this evidence, the Court finds that Rogerson could have reasonably expected to sell 47 duct and controller units (approximately 15% of 316 original equipment units) as spare parts at a price of $65,740 per unit (3.8 times the original equipment price of $17,300 per unit). Rogerson's projected gross revenues from the sale of spare parts are therefore $3,089,780.00 and it shall thus be awarded $463,467.00, or 15% of such gross revenues, as lost profits from the sale of spare parts.

3. *Lost profits from prospective contracts with unrelated third parties.*

Rogerson contends that it is entitled to recover damages for the loss of prospective parts supply contracts with third party air-

craft manufacturers. According to Rogerson, its Composite Division had bid on parts contracts with Hughes Helicopter and Fokker after being awarded the Fairchild SF–340 duct and controller contract. Rogerson alleges that upon learning of the Fairchild default termination, both Hughes and Fokker discontinued further contract negotiations and did not award Rogerson the parts contracts, even though Rogerson explained the default termination was unjustified.

■ Rogerson's claim for damages for the loss of the Hughes and Fokker contracts is essentially a claim for consequential damages which is barred under New York law. N.Y.U.C.C. § 1–106(1) (McKinney 1964); *Petroleo Brasileiro, S.A., Petrobas v. American Oil Corp.*, 372 F.Supp. 503, 508 (E.D.N.Y.1974). Rogerson's claim must also be rejected as a claim for unforeseeable and speculative damages. There is no indication that Fairchild knew or had reason to know of Rogerson's negotiation with Hughes or Fokker, or that its breach of the duct and controller contract could lead to Rogerson's loss of those contracts, and absent such evidence, contractual damages may not be awarded. *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep.R. 145 (1854).[7] Even if the Court were to find that Fairchild should have known of Rogerson's negotiations for other parts contracts and therefore the loss of the contracts was foreseeable to Fairchild at the time of its breach, the terms of such contracts were never finalized and there is therefore no reliable evidence upon which a sufficiently certain award of damages could be based.

*See Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881, 889 (S.D.N.Y.1975), *aff'd*, 542 F.2d 111 (2d Cir.1976). Accordingly, the Court must and does refuse to award Rogerson damages for the loss of the Hughes and Fokker contracts.

*4. Overhead.*

■ Overhead is generally allowed as an element of damages in a breach of contract action to the extent that the claimed overhead is not reduced as a result of the defendant's breach. N.Y.U.C.C. § 2–708(2) (McKinney 1964); *Vitex Mfg. Corp. v. Carbitex Corp.*, 377 F.2d 795, 798–99 (3d Cir. 1967); *R & I Electronics Inc. v. Neuman*, 66 A.D.2d 836, 838, 411 N.Y.S.2d 401, 405 (N.Y.1978). Rogerson has established that the termination of the duct and controller contract did not result in any significant reduction in its general and administrative overhead, and that the overhead for which it was to be reimbursed under the duct and controller contract cannot be recovered through other business. Thus it is entitled to recover in damages a reasonable amount for such unabsorbed overhead.[8]

Although there are several suitable methods for calculating the amount of damages for unabsorbed overhead, *see e.g.*, *Vitex Mfg. Corp., supra*, at 798–99, the Court is of the opinion that the ratio of overhead to profit used in determining the original duct price provides the most reasonable basis for computing the overhead damages to be awarded to Rogerson. In pricing the original duct, Rogerson allocated an amount equal to 1.28 times profit as

---

**7.** Rogerson relies on *Wallace Steel v. Ingersoll-Rand Co.*, 739 F.2d 112 (2d Cir.1984), to support its claim for damages for the loss of the Hughes and Fokker contracts. Such reliance is misplaced. In *Wallace Steel,* the court did not consider or decide the issue of whether the plaintiff was entitled to damages for the loss of third party contracts. Rather, the court affirmed an award of damages for breach of a contract between the plaintiff and the *defendant,* stating that in computing damages, the market value of the contract materials could be determined by looking to the plaintiff's transactions with third parties. *See* 739 F.2d at 115. Thus, *Wallace Steel* has no application to the present case.

**8.** An award of damages for unrecovered overhead is particularly appropriate in this case. In pricing all of its aircraft parts subcontracts, Rogerson allocated a pro rata share of its total general office and administrative overhead to each subcontract. Since the price of each subcontract was fixed, upon breach of any one contract, Rogerson could not recoup the overhead allocated to the breached contract by adjusting the prices of the remaining subcontracts. Thus, a failure to award overhead damages would force Rogerson to fully absorb the general office and administrative overhead it had allocated to the duct and controller contract. *See generally Vitex Mfg. Corp. v. Carbitex Corp.*, 377 F.2d 795, 798–99 (3d Cir.1967).

the amount of general and administrative overhead costs to be recovered under the duct and controller contract. After adjusting this ratio to fix profit at 15% of revenues, as was done in calculating Rogerson's anticipatory profits damages, the Court finds that Rogerson should be awarded 1.46 times its lost profits as unrecovered overhead damages, which amount to $1,197,229.20 as damages for overhead that was to be recovered through original equipment sales, and $676,661.82 as damages for overhead that was to be recovered through the sale of spare parts.[9]

■ Rogerson also asserts that it is entitled to be compensated for its nonrecurring costs incurred primarily in retooling to accomodate Fairchild's change orders. Such recovery would be contrary to the spirit of the August 7 Agreement under which Rogerson agreed to absorb its nonrecurring and start-up costs, and would in effect be a windfall to Rogerson since it will be adequately compensated for cost increases occasioned by the Fairchild change orders by the damages we have awarded for lost profits and unrecovered overhead. The Court will thus not award Rogerson damages for nonrecurring costs.

### 5. Incidental damages.

Under the Uniform Commercial Code, an aggrieved seller may recover from a defaulting buyer incidental damages and commercially reasonable expenses incurred as a result of the buyer's breach. N.Y.U.C.C. § 2–710 (McKinney 1964).[10] Since the parties basically agree that as a result of

Fairchild's termination of the duct and controller contract, Rogerson incurred $155,000 in expenses for such items as benefits and salary for idle workers, unusable inventory, and materials storage, etc., the Court will award Rogerson $155,000 in incidental damages.

### 6. Interest.

#### a. Prejudgment

Rogerson seeks to recover prejudgment interest on the damages awarded in this action, even though its damage claim was unliquidated until trial.

Section 5001(a) of the New York Civil Practice Law and Rules provides that interest shall be recovered upon a sum awarded because of a breach of contract. N.Y.C.P.L.R. § 5001(a) (McKinney 1963).[11] Section 5001(a) entitles a party suing in contract to receive prejudgment interest on its recovery as a matter of right regardless of whether the claim was liquidated or unliquidated so long as the amount of the claim was readily ascertainable as of a fixed date prior to judgment. *See Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527, 546 (S.D.N.Y.1972), *aff'd*, 485 F.2d 1355 (2d Cir.1973). Phrased another way, the test for awarding prejudgment interest is not whether the amount sought was liquidated or unliquidated, but rather whether the plaintiff was entitled to receive a certain sum on a fixed date and whether the defendant could have determined what was due with reasonable certainty, either by computation alone or by computation in connection with established market values

9. The Court emphasizes that by basing Rogerson's overhead damages on the profits Rogerson would have earned from the sale of 158 duct and controller shipsets, it has implicitly limited the time period for which Rogerson may recover overhead damages to the end of 1987, since the 158th duct and controller shipset would have been delivered at the end of that year. After 1987, Rogerson would be expected to recover any unreimbursed overhead through new aircraft parts subcontracts.

10. N.Y.U.C.C. § 2–710 provides in full:
§ 2–710. Seller's Incidental Damages
Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping

delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

11. N.Y.C.P.L.R. § 5001(a) provides in full:
§ 5001. Interest to verdict, report or decision
(a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

or other generally recognized standards. *See Faber v. City of New York*, 222 N.Y. 255, 118 N.E. 609 (1918). *See generally* Annot., 4 A.L.R.2d 1388 (1949); Restatement (Second) of Contracts § 354 (1981).

The recent decision in *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014 (S.D.N.Y.1984), *aff'd*, 762 F.2d 990 (2d Cir. 1985), a case cited by Rogerson, illustrates the application of the foregoing rule. In *Harmonay*, the plaintiff subcontractor sued the defendant contractor to recover damages caused by the defendant's delay in performing its obligations under the contract. The court found for the plaintiff and awarded damages for, *inter alia*, lost profits and uncompensated overhead, calculating both elements of damage as a percentage of the net costs actually incurred by the plaintiff as a result of the defendant's delay. 597 F.Supp. at 1031. In addition, the court granted the plaintiff prejudgment interest from the date of the contract completion. *Id.* at 1036. The crucial point to be emphasized in the *Harmonay* decision is that the damages awarded there were calculated based on costs actually incurred and therefore fixed well before judgment. Therefore, an award of prejudgment interest was appropriate, since the plaintiff's damages were readily ascertainable by the defendant prior to trial by reference to an objective standard.

A review of New York case law has revealed that other than the *Harmonay* decision, there is no case dealing directly with the issue of awarding prejudgment interest on damages for prospective losses which are disputed by the parties until trial.[12] However, in applying California law regarding prejudgment interest, which California law is substantially similar to New York law, the California courts have

generally not awarded prejudgment interest on projected contract damages where such damages could not be ascertained except by trial. For example, in *Lineman v. Schmid*, 32 Cal.2d 204, 195 P.2d 408 (1948), the California Supreme Court refused to award prejudgment interest to an aggrieved buyer under a contract for the sale of flour where the flour had no established market value, stating: "The rule appears to be uniform, whether the case involved contract price or reasonable value, that interest is not allowable when damages cannot be computed except upon conflicting evidence ... because of the absence of established or reasonably ascertainable market prices or values. In such cases, since the amount of damages cannot be resolved except by accord, verdict or judgment, interest prior to judgment is not allowable." 32 Cal.2d at 212, 195 P.2d 408. *Accord: Iverson v. Spang Industries, Inc.*, 45 Cal.App.3d 303, 311, 119 Cal.Rptr. 399 (1975). The California courts have noted that an award of prejudgment interest is particularly inappropriate in cases where there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award, since that fact militates against the finding of certainty required for an award of prejudgment interest. *See Polster, Inc. v. Swing*, 164 Cal.App.3d 427, 434–36, 210 Cal.Rptr. 567 (1985).

■ In the present case, it is clear that Rogerson's damages for its lost prospective profits and overhead were not readily ascertainable by Fairchild prior to trial, and therefore an award of prejudgment interest should not be made. Unlike the *Harmonay* case, *supra*, Rogerson's damages were not determined by reference to some

---

**12.** The remaining cases cited by Rogerson to support its contention that under Section 5001(a), courts have frequently awarded prejudgment interest where the amount of damages were not ascertained until trial, are inapposite to the present case, since in the cited cases damages were calculated by reference to an objective standard and were therefore capable of being made certain prior to trial. In *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984), the plaintiff's lost profits damages for

breach of the contract at issue were determined by reference to the profits actually earned by the plaintiff in a previous year under the same contract. Similarly, in *Rock Transport Properties Corp. v. Hartford Fire Insurance Co.*, 312 F.Supp. 341 (S.D.N.Y.1970), the plaintiff's damages for the loss of its scows were calculated based on the insured value of the scows expressly stated in the insurance contract. Thus, in those cases, an award of prejudgment interest was clearly appropriate under New York law.

objective standard or market value, but rather were calculated based on projected *future* sales of duct and controller units, an issue vigorously contested by the parties and not finally resolved until the entry of this decision and judgment. Similarly, the amount of Rogerson's incidental damages were not capable of being made certain except upon conflicting evidence resolved at trial.[13] Accordingly, in view of the foregoing discussion and the New York rule regarding prejudgment interest, the Court must and does refuse to award Rogerson prejudgment interest on its damages.

The Court notes that even if prejudgment interest was awardable as a matter of law in this case, Rogerson would still not be entitled to such an award. In cases such as the case at bar, where damages are calculated based on the sale of goods to be delivered over time, prejudgment interest, if awardable, is to be calculated from a reasonable intermediate date in the delivery schedule. N.Y.C.P.L.R. § 5001(b) (McKinney 1963); *Kachian v. Aronson,* 123 Misc.2d 743, 475 N.Y.S.2d 214 (N.Y.Civ. Ct.1984). Here, the delivery of the 158 shipsets of ducts and controllers would have commenced in 1984 and continued through 1987. Adjusting this schedule slightly to account for billing and payment time and production delays inherent in the aircraft industry, any reasonable intermediate date for the calculation of prejudgment interest would occur *after* the entry of judgment in this case. An award of prejudgment interest is therefore inappropriate for this reason as well.

### b. *Postjudgment*

Under New York law, Rogerson is entitled to receive postjudgment interest at the legal rate of 9% per annum simple interest, calculated from the date of entry of the judgment herein. N.Y.C.P.L.R. § 5003 (McKinney 1963); N.Y.C.P.L.R. § 5004 (McKinney Supp.1986). *See also* Restatement (Second) of Contracts § 354, comment a (1981).

### 7. *Attorneys and Expert Witness Fees.*

Finally, Rogerson seeks recovery of its attorneys fees, and its expert witness fees. Generally, each party to a lawsuit must bear its own attorneys fees, unless there is a statute or express contractual provision authorizing the award of attorneys fees to the prevailing party. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 257–60, 95 S.Ct. 1612, 1621–23, 44 L.Ed.2d 141 (1975); *United States v. Standard Oil Co.,* 603 F.2d 100, 103 (9th Cir.1979). However, the Court may also award attorneys fees to a prevailing party if the Court finds that the losing party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Beaudry Motor Co. v. Abko Properties, Inc.,* 780 F.2d 751, 756 (9th Cir.1986); *Standard Oil, supra,* at 103.

In the present case, there is ample evidence in the record supporting the conclusion that Fairchild acted oppressively and in bad faith in dealing with Rogerson. Subsequent to the problems with the duct and controller unit in the February 1983 icing tunnel test, Fairchild actively solicited alternative suppliers for the duct and controller program without informing Rogerson, as it should have done under the well-established "dual supplier" procedure of the aircraft industry. Then, upon finding a supplier that would offer it contract terms more favorable than those in the Rogerson contract, Fairchild terminated the duct and controller contract for default, even though it conclusively knew that the contract was not in default. In informing Rogerson of its decision to terminate the contract for

---

**13.** The necessity of a trial to ascertain Rogerson's damages is well illustrated by the large discrepancy between the damages demanded by Rogerson prior to trial and the damages actually awarded by the Court after the trial. In its complaint in this action, Rogerson demanded in excess of $10 million compensatory damages. In its pretrial papers, Rogerson raised its compensatory damages demand to over $13 million.

As set forth in this decision, the Court has awarded Rogerson $3,312,378.00 in compensatory damages, or approximately 25% of the damages last demanded by Rogerson. Such a large gap seriously counsels against an award of prejudgment interest. *See Polster, Inc. v. Swing,* 164 Cal.App.3d 427, 435–36, 210 Cal.Rptr. 567 (1985).

default, Fairchild management deliberately decided to "orchestrate a confrontation" with Michael Rogerson in order to preclude any discussion of the contract termination and force Rogerson into a minimal settlement. Finally, knowing that its default termination was groundless, Fairchild nonetheless responded to Rogerson's complaint in this action by still asserting a counterclaim against Rogerson for breach of contract based on Rogerson's alleged default on the duct and controller contract. Despite the fact that Fairchild knew in July, 1983 that Rogerson was in fact not in default of the contract, it did not dismiss its counterclaim until December, 1984, more than one year after this action was instituted. The *Beaudry* case, *supra*, is particularly relevant in this respect. In *Beaudry*, the plaintiff brought a private antitrust action thirteen years after its cause of action accrued, even though such actions were governed by a four year statute of limitations. Subsequently, the plaintiff abandoned its antitrust claim and changed its theory of recovery. The Ninth Circuit found that under such circumstances, the district court's award of attorneys fees did not constitute an abuse of discretion, since the plaintiff acted unreasonably and in bad faith in pursuing a claim it should have known was not colorable. 780 F.2d at 756–57. In view of the strong similarity between the present case and the *Beaudry* case, and the overwhelming evidence of Fairchild's bad faith in completely disregarding Rogerson's rights under the duct and controller contract, the Court will award Rogerson its attorneys fees and expert witness fees.[14]

■ Rogerson has requested that it be awarded $748,882.56 in attorneys fees and $164,686.00 in expert witness fees for its expert accountant witness. In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), the Ninth

Circuit set forth twelve factors that must be considered in determining the reasonableness of an award of attorneys fees: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 526 F.2d at 70. Evaluating Rogerson's fee request in light of the twelve *Kerr* factors, the Court finds the amount of $748,882.56 for attorneys fees sought by Rogerson to be reasonable. In particular, the Court notes that the legal and factual issues presented in this case were difficult ones, especially because of the complex technical and accounting issues to be resolved and the voluminous number of documents involved. The Court also notes that Rogerson's attorneys, as well as Fairchild's attorneys, were highly qualified and exhibited great skill and preparedness in presenting the evidence and issues. Finally, it should also be emphasized that the hours expended by Rogerson's attorneys, and the rates at which such time was billed, as set forth in Rogerson's detailed application for attorneys fees, were very reasonable in light of the protracted nature of this litigation, the results ultimately obtained, and the prevailing community standards.

Similarly, the amounts requested by Rogerson for reimbursement of its expert accounting witness fess are also very reasonable in light of the time and skill required of the expert and the difficulty of

---

**14.** Fairchild argues that Rogerson is not entitled to attorneys fees and expert witness fees since it was not the "prevailing party" in this action. Although Rogerson did recover much less than it sought in its complaint, it nonetheless prevailed completely on its primary theories of liability, and recovered far more in damages than the amount offered by Fairchild to settle this matter. Thus, the Court finds that Rogerson was in fact the "prevailing party" in this litigation.

the issues presented. Accordingly, the Court awards Rogerson $164,686.00 in expert witness fees.

The customary court costs are assessed in favor of Rogerson, to be claimed in a bill of costs and taxed by the Clerk of the Court. If such costs are challenged by Fairchild, then upon motion these costs will be taxed by the Court.

## III. ORDER FOR JUDGMENT

Upon the evidence adduced in this matter and the law applicable thereto, the Court finds and concludes that the defendant Fairchild Industries, Inc. is liable for breach of contract and awards the plaintiff Rogerson Aircraft Corp. damages in the amount of $820,020.00 for lost prospective profits from original equipment sales; $463,467.00 for lost prospective profits from spare parts sales; $1,873,891.02 for unrecovered overhead; $155,000.00 for incidental damages; $748,882.56 in attorneys fees; $164,686.00 for expert witness fees; postjudgment interest as provided by law; and costs of suit incurred herein.

Let judgment be entered in accordance with the findings of fact and conclusions of law set forth in the foregoing decision and this Order for Judgment.