**William H. HEBERT, Plaintiff,**

v.

**MASSACHUSETTS TEACHERS ASSOCIATION RETIREMENT PLAN, et als., Defendants.**

**Civ. A. No. 84–3465 Mc.**

United States District Court, D. Massachusetts.

Jan. 27, 1986.

**536**

William F. Macauley, Craig & Macauley Professional Corp., Boston, Mass., for plaintiff.

Robert J. Muldoon, Jr., Sherin & Lodgen, Boston, Mass., for Mass. Teachers Ass'n Retirement Plan.

James F. O'Brien, Goulston & Storrs, and Walter J. Connelly, Lyne, Woodworth & Evarts, Boston, Mass., for Mass. Teachers Ass'n Retirement Plan Committee.

## OPINION

McNAUGHT, District Judge.

This action came on to be tried without jury. I have heard the evidence, and been

favored by counsel with proposed findings of fact and conclusions of law.

The plaintiff, former Massachusetts Teachers Association Executive Director-Treasurer, by way of his amended complaint, sought relief against the Massachusetts Teachers Association (MTA), against the Massachusetts Teachers Association Retirement Plan, and against the Retirement Plan Committee of the Association (RPC). There are three counts in the amended complaint. The claims in counts one and two are ERISA counts (Employee Retirement Income Security Act of 1974), while count three is a pendent state law claim. The court is required to decide (1) whether Doctor Hebert is entitled to receive his retirement benefits in a lump-sum payment; (2) whether the Association and the Committee should be penalized for alleged failure to provide information, in violation of ERISA, and (3) whether the Association should be ordered to perform in accordance with plaintiff's interpretation of a deferred compensation agreement.

The plaintiff, a former school teacher, was first hired by the Massachusetts Teachers Association in 1959 as an assistant to the Executive Director. After holding a number of positions under written contracts, he, in 1964, became Executive Director himself, and two years later, Executive Director-Treasurer. Each contract contained within its provisions the statement that it superseded any prior employment contract. A contract dated June 17, 1972 specifically provided: "(T)his agreement shall supersede and terminate an existing agreement of employment between the parties dated September 1, 1971, upon the commencement thereof." Similar words—"supersede and terminate"—were used in contracts dated June 22, 1973, January 23, 1976 and June 20, 1979. On March 25, 1983, Doctor Hebert announced his intention to retire early. His normal retirement date would have been August 14, 1994 (his sixty-fifth birthday). His contract term was to end on June 30, 1984, but he distributed a proposed Agreement to the Board (adopted unanimously by them) which provided in part (1) that Hebert would terminate his full-time employment on June 30, 1983; (2) that he would, however, continue to receive his salary until June 30, 1984; (3) that from June 30, 1983 to June 30, 1984 he would perform consulting services "as may from time to time be requested by MTA up to twenty hours a month"; that on June 30, 1984 he would retire "under the best options then available to him" from the MTA retirement plan on September 1, 1984 (Exh. 5) and (4) that "This agreement upon its execution is to supersede the existing employment contract and govern the future relationship between Hebert and MTA".

On April 22, 1983 Hebert and his deputy (Jerome Landry) issued a memo to the MTA Executive Committee recommending the adoption of an Early Retirement Incentive Plan (ERIP) for managerial employees. On June 3 of that year, the Board voted its implementation. It provided, for eligible persons, election between the Retirement Plan currently in effect, or an Optional Retirement Plan, not yet in existence. This Optional or Alternative Retirement Plan was created by the "Eleventh Amendment to the Plan", which was adopted by the MTA Board July 9, 1984. On July 29th, 1983 an enrollment form was sent to managerial employees, to be submitted by those persons wishing to enroll. (Doctor Hebert submitted his enrollment form two weeks before his fifty-fifth birthday, which occurred August 14, 1984).

Defendants' emphasize the chronology of these events, especially in Proposed Findings 44 and 45: "One of the 'incentives' which Hebert had proposed in his April 22, 1983 ERIP (Early Retirement Incentive Plan) memorandum was the possibility of electing '[t]he Retirement Plan currently in effect; or ... [t]he Optional Retirement Plan.' Plaintiff's Exhibit 6, Section 2." Proposed Finding 45, which I adopt, reads: "As of the date of ERIP's adoption, no 'Optional Retirement Plan' existed." Implementation of ERIP was voted by the Board on June 4, 1983, at which time Doctor Hebert was still a managerial employee.

Section 3.08 of the Plan, as amended by the Eleventh Amendment (adopted July 9, 1984), provided that after July 1, 1983 any FSO member and eligible non-unit member "may elect in writing to have his or her benefits under the Plan determined under such alternative plan provisions". Section 10.09 (as amended by the Eleventh Amendment) provided that any Alternative Plan Member who terminated employment on or after July 1, 1983 could receive a lump sum payment in lieu of monthly retirement benefits payments. Section 3.08, as amended, granted the election to any eligible non-unit member in the employ of the Association on June 30, 1983. It was on July 24, 1984, after the Amendment had been adopted, that Hebert sent a writing stating that he elected to receive his benefits under the Optional Retirement Formula. On September 20th, the plaintiff wrote to the Chairman of the RPC, and stated that he was choosing "the option of cash-out value of my retirement benefit." Plaintiff's Exhibit 13. Finally, on October 31, 1984, Doctor Hebert filed the complaint in this action.

I find that as of June 30, 1983, the plaintiff "terminated his employment" as MTA Executive Director-Treasurer. Although he was employed by the Association on the 30th of June, from July 1, 1983 to June 30, 1984 Doctor Hebert functioned as a consultant. His chief service in that regard was attendance at an annual meeting of the National Education Association. The evidence disclosed that as of July 1, 1983 he did not have an office at the MTA, no secretary, nor any supervisory authority. He was not an executive, nor an administrator. On October first of that year, he became President and Chairman of the Board of the First Consumer Life Insurance Company, and received an annual salary from that company.

If one accepts the definition of the word "employee" as used in the Plan which became effective in 1967, he would conclude that Doctor Hebert was an employee of the MTA through June 30, 1983, but was not an "employee" after that date. An "employee" was a person scheduled to work at least a thousand hours in a plan year (which began July 1 of a calendar year and terminated the next June 30th). Doctor Hebert was not scheduled to work a thousand hours in 1983–1984. Plaintiff's Exhibit 1, § 2.04. Employment as of June 30, 1983, however, is critical to Doctor Hebert's claim to eligibility under the optional formula. He met that critical requirement.

When opening statements were made at trial, plaintiff's counsel asserted that with respect to proof of entitlement to a lump sum payment of benefits, Dr. Hebert's bow had *three strings*. He could recover on the theory of applicability of the early retirement incentive plan, the theory of "provisions in his employment agreements" and, finally, by reason of an "unwritten custom". There was no evidence with respect to the last on which I could rely; hence, the third theory is discounted altogether.

First: the ERIP theory. The MTA retirement plan was adopted effective April 1, 1967. (Exhibit 1) As stated hereinbefore, it was amended eleven times before this action was commenced. Under that plan (Article 7), if a person attained the age of fifty-five and had served for ten or more years, he could retire and expect to receive a monthly early retirement benefit. Doctor Hebert and Mr. Landry recommended the early retirement incentive plan, and I find that Doctor Hebert was motivated to make the recommendation partially in the hope that he himself would benefit thereby. He recommended it within a few weeks of his announcement of his planned resignation, and the acceptance of it on April 4th by the Board. The benefits available under ERIP included a cash-out option; hence, when the Board voted to implement ERIP for managerial employees on June 3, 1983, if it had at that time adopted the Eleventh Amendment, and made it applicable to persons *then* employed, there would have been no doubt of its application to Doctor Hebert's situation. Doctor Hebert was a non-unit member [not a member of Field Services Organization, Massachusetts Association of Teacher Attorneys, or the Massachusetts Teachers Association Staff Organization

("FSO", "MATA" and, "MTASO")] and a managerial employee on June 3rd. Two modes of eligibility were provided by the Plan as amended—(1) cease employment or retire on or after July 1, 1983 *or* (2) be in the employ of the Association as a non-unit member on June 30, 1983. This second mode, as enunciated in Section 3.08 as amended by the Eleventh Amendment is the source of plaintiff's entitlement to the lump sum cash payment. It provided in part that any eligible non-unit member in the employ of the Association on June 30, 1983, could elect in writing to have his or her benefits under the Plan determined under such alternative plan provisions. In July of 1984, then, when Section 3.08 was revised, two time periods for application were defined. For persons hired on or after July 1, 1983 the alternative plan provisions automatically applied. For those who were employed June 30, 1983, the application of the alternative plan provision was optional. The plaintiff, I conclude, fell within the last category, and qualifies under the Early Retirement Incentive Plan for the lump sum payment.

■ He does not, in my opinion, qualify for lump sum payment of benefits by reason of his employment agreements in and of themselves. The employment agreement of 1979 entitled Hebert, it is true, to fringe benefits available to other executive staff members (including FSO members). On March 3, 1983 the MTA and the FSO agreed (Exhibit 4, Article 15) to a group of benefits which included the "cash-out" option. It was known as the "Alternative Plan", and this was the plan which was eventually incorporated into the Plan by adoption of the Eleventh Amendment. Doctor Hebert, however, drafted the March 1983 agreement which "upon its execution is to supersede the existing employment contract and govern the future relationship between Hebert and the MTA". This was the plaintiff's choice of language. It was he who used the word "supersede". *Webster's New International Dictionary* (2d Ed.1948) offers the definition: "to make void or useless ... to make unnecessary or superfluous..". *The American Heritage Dictionary*, College Edition, 1976, similarly offers: "... To take the place of; replace or succeed.. To cause to be set aside or displaced..". Plaintiff tries to make much of the fact that in prior agreements, the phrase "supersede and terminate" had been used. He argued that this evidenced an intention on his part that the 1979 agreement be "terminated" only where it was inconsistent with the 1983 agreement. This, I cannot accept. He knew the meaning of the word "supersede". There is no ambiguity, and if there were any, it would have to be resolved against the draftsman of the document.

Plaintiff nonetheless is entitled to have his retirement benefits calculated in a single lump sum payable as of October 1, 1984, as determined. He exercised his election of the cash-out option by submitting a proper written document.

■ Two further matters with respect to the first count. Plaintiff has asserted that the defendant Retirement Plan Committee through its agents and employees has acknowledged liability for a lump sum payment [by reason of an alleged adoptive admission under Rule 801(d)(2)(B) and a vicarious binding admission of an employee under Rule 801(d)(2)(D) of the Rules of Evidence]. I do not find liability on such a basis. The evidence was *admitted* for consideration under the rules cited, but I am not persuaded that plaintiff should prevail on the factual issues. At page 28 of his proposed findings of fact, plaintiff argues that "The Committee told Hebert he was eligible for a lump sum payment in its memorandum of February, 1984 (Exhibit 2). In two separate letters, dated September 21, 1984 and January 21, 1985, the Committee's own actuary conceded his eligibility...". Wrong. Only the Retirement Plan Committee had the right to determine eligibility. The Committee at no time communicated such a decision. The actuary calculated plaintiff's benefits based on the hypothesis that Hebert was eligible. This was not a determination of eligibility or an authorized statement to that effect. Rule

801(d)(2)(C) is inapplicable. The recipient of the letters from the actuary was not a member of or an employee of the Retirement Plan Committee, nor did she have any power to determine eligibility.

■ Finally, I decline the request of defendants to find that there was any removal on August 18, 1984 of the features of ERIP from the Plan, despite an apparent concession by Hebert, on the stand, to the effect that he was "informed" that the cash-out option was repealed. It was "reconsidered", but not repealed.

■ Count Two sets forth the claim under 29 U.S.C. § 1132 which provides that a plan administrator who fails or refuses to comply with a request for information which the administrator is required to furnish may be liable (in the discretion of the court) in an amount of up to $100 a day. In this case the Retirement Plan Committee is the Plan Administrator. (Article 14.-01).

On September 27, 1984 plaintiff sent a letter to the Association's Executive Director demanding "legal opinions respecting my rights", and an actuarial report defining benefits along with a demand that certain action be taken. He had, by letter dated September 20th, said he wished to exercise the option of cash-out value of his benefit. On October 19th, the RPC Chairman acknowledged receipt of the September 20th letter and wrote to plaintiff that the Committee was studying the plan as it applied to his case. I conclude that this was most reasonable conduct since the Committee was not scheduled to meet until November and especially since 29 U.S.C. § 1133 provided that notice should be given in writing to one whose claim for benefits has been denied setting forth in simple terms the reason for the denial. When the September 27th letter was written, the claim had not been denied. Since the $100 a day penalty is punitive in nature, it certainly should not be imposed in this case. The facts do not disclose a basis for the imposition of punishment. On January 4, 1985 it was agreed that the actuarial information Hebert had requested would be sent to him. In the opinion of the Court, this count should not have been brought. The request that was made for information wasn't even directed to the Committee. It was sent to the Executive Director of the Association.

■ Count Three: Defendants concede that the Association was obliged by reason of a 1972 "Deferred Compensation" agreement to pay for Hebert's benefit the annual portion of his term insurance "until such time as Hebert elects to withdraw the benefits under the plan." (Exhibit 5) The March 25, 1983 agreement continued in force the pertinent provision of the 1972 deferred compensation agreement. That provided in part, as amended, that "If the employment of the Executive ... shall terminate prior to his Retirement date ... the amount to which (he) shall be entitled, upon termination (which date is *June 30, 1984*) shall be an amount equal to what the cash surrender value of said Policy would have been at the Date of Termination plus the then value of all accumulated dividends and other amounts had the Policy been kept in full force until the date of termination of employment." Hebert's employment terminated prior to his retirement date; hence plaintiff, I conclude, is entitled to either the cash surrender value or actual ownership of the policies maintained by the Association. Such an election should have been made by the plaintiff on June 30, 1984. The Association is not required to continue to pay the policy premiums.

Plaintiff may submit a form of judgment within twenty-one (21) days. Within seven (7) days thereafter, defendant may indicate their assent to the entry of such judgment in writing, or submit their proposed form of judgment.