**Edward T. CLARKE, Plaintiff,**

v.

**The BANK OF NEW YORK, Defendant.**

**No. 86 Civ. 5448 (JMC).**

United States District Court,
S.D. New York.

May 19, 1988.

Edward T. Clarke, pro se.

Suellen M. Galish, Bank of New York, New York City, for defendant.

## OPINION

CANNELLA, District Judge.

Following a nonjury trial on the merits, the Court finds for the plaintiff in part. Fed.R.Civ.P. 52(a).

## BACKGROUND

A bench trial of this action was held on October 20 and 21, 1987. The following discussion constitutes the Court's findings of fact and conclusions of law.

In 1972, the Bank of New York, Inc. [the "Bank"], instituted an Employee Profit–Sharing Plan [the "Profit–Sharing Plan"]. The Profit–Sharing Plan is both an "employee pension benefit plan" and a "defined contribution plan" under the Employee Retirement Income Security Act of 1974 ["ERISA"] Pub L. No. 93–406, 88 Stat. 832 (codified at 29 U.S.C. §§ 1001 *et seq.* (1982)), and is, therefore, subject to all the provisions of ERISA.

Participation in the Profit–Sharing Plan is automatic upon completion of two full years of continuous employment with the Bank. Participants may, however, elect to receive up to one-half of the Bank's contribution in cash. Participants may also elect to make additional voluntary contributions, but, the total of such contributions may not exceed an aggregate of ten percent of their base salary. Vesting is one hundred percent upon participation, and the value of a participant's fund is generally payable only upon death, retirement or termination of employment. Participants receive a quarterly statement of their account as well as annual notices and election cards.

Prior to the fall of 1981, participants in the Profit–Sharing Plan were afforded only three investment options (1) Fund A, which invests largely in common stocks other than those of the Bank, (2) Fund B, which

invests in fixed income securities other than those of the Bank, and (3) Fund C, which invests largely in short-term commercial paper. The Bank, as trustee of the Profit–Sharing Plan, invests and reinvests the assets of each Fund at its discretion.

In addition to the Profit–Sharing Plan, the Bank instituted a Stock Purchase Plan to provide its employees with a convenient and uniform method for purchasing stocks. The Stock Purchase Plan is not subject to the provisions of ERISA. Participation in the Stock Purchase Plan is entirely voluntary and there is no contribution to this plan from the Bank. All employees over the age of eighteen are eligible to participate in the Stock Purchase Plan once they have completed three full months of continuous employment. Prior to 1982, participants in the Stock Purchase Plan could not purchase Bank stock through the plan.

Finally, the Bank's Profit–Sharing Trust retained a separate sub-fund known as the County Trust Holding Company Fund [the "sub-fund"]. Participants in the sub-fund were former employees of the County Trust Holding Company which merged with the Bank in 1969. As part of the merger agreement, the County Trust Profit–Sharing Plan was converted into shares of the Bank's common stock and 6¼% convertible debentures ["bonds"]. A separate sub-fund was created for these holdings because participants in other plans were not entitled to invest in the Bank's stocks and/or bonds. In fact, participants in the sub-fund could not invest further in the Bank's stocks and/or bonds, but rather, all income earned by the sub-fund was transferred to either Fund A, Fund B or Fund C at the election of the participants. Participants in the sub-fund received the same company contribution under the Profit–Sharing Plan and had the same investment options as other Profit–Sharing Plan participants.

In the fall of 1981, the Bank's Board of Directors authorized an amendment to the Profit–Sharing and Stock Purchase Plans to allow for the purchase of the Bank's common stock. This stock was to be purchased at a 5% discount. The 1981 amendment, which resulted in the creation of a new investment fund entitled Fund D, became effective January 1, 1982.

On December 7, 1981, the Bank distributed to all employees a memo announcing that the Profit–Sharing and Stock Purchase Plans had been amended to allow for the purchase of the Bank's common stock at a discount of 5%. Plaintiff's Exh. 1. This memo was accompanied by a prospectus detailing the provisions of the new amendment. Plaintiff's Exh. 2. Under the terms of the memo, the purchase price of shares acquired through Fund D would be a per share price equal to 95% of the average daily high and low price quoted by the New York Stock Exchange *for the last five business days immediately preceding the purchase date.* Plaintiff's Exh. 1. Under the terms of the prospectus, however, the purchase price of Bank stock acquired through Fund D would be a per share price equal to 95% of the average daily high and low price quoted by the New York Stock Exchange for *the five trading days ending with the purchase date.* Plaintiff's Exh. 2, at 8.

On the same day, a second memo was sent from the Profit–Sharing Committee [the "Committee"] to all participants in the Profit Sharing Plan. Plaintiff's Exh. 2. This memo delineated the effect the new amendment would have on voluntary contributions to the Profit–Sharing Plan and transfers from Funds A, B or C to the new Fund D. Under the terms of this memo, Bank contributions invested in Fund D would buy shares for the participants' account based upon a per share price equal to 95% of the average daily high and low price quoted by the New York Stock Exchange for *the last five business days preceding January 12, 1982.* Plaintiff's Exh. 2 at 2.

Voluntary contributions would be invested in Fund D on the first business day of each month for money received during the previous month. *Id.* A participant's voluntary contribution to Fund D would purchase stock at a per share price equal to 95% of the average daily high and low price as reported by the New York Stock Exchange for the *last five business days of*

*the prior month. Id.* For funds transferred to Fund D from either Fund A, Fund B or Fund C, the money transferred would buy shares based upon a purchase price equal to 95% of the average daily high and low price quoted by the New York Stock Exchange for *the last five business days preceding January 4, 1982. Id.* This memo was accompanied by an election card for those Profit–Sharing Plan participants who wished to have their 1981 Bank contribution invested in Fund D. This memo also referred participants to the first December 7th memo for additional information about the new Fund D. Plaintiff's Exh. 2, at 1.

On December 9, 1981, the Committee sent a memo to all participants in the sub-fund notifying them of the new Fund D investment opportunity. Plaintiff's Exh. 4. Participants were informed that the income earned by the sub-fund could be invested in the new Fund D. To take advantage of this opportunity, however, participants would have to liquidate all of their sub-fund holdings. Participants were not allowed to transfer their stock directly from the sub-fund into Fund D. Participants who elected to liquidate their sub-fund holdings had to notify the Committee by December 14, 1981 and once that notification was received by the Committee it was irrevocable. In addition, once a participant chose to liquidate his sub-fund holdings he would not be entitled to invest in the sub-fund in the future. This memo did not refer participants to either of the previous memos or the prospectus for additional information regarding the new amendment.

Under the terms of the December 9th memo the trustee, after receiving all liquidation requests, was to sell the stocks and bonds "through December 31, 1981." Plaintiff's Exh. 4, at 2. A participant's dollar interest in the proceeds of the sub-fund would be transferred to either Fund A, Fund B, Fund C or Fund D as directed by the participant after "the December 31, 1981" valuation date. Plaintiff's Exh. 4, at 1. The net proceeds of the liquidation of the sub-fund holdings would purchase stock for Fund D at a per share price equal to 95% of the average daily high and low

price quoted by the New York Stock Exchange for *the last five business days of December 1981.* Plaintiff's Exh. 4, at 2.

During December 1981, plaintiff was an employee of the Bank and a participant in the sub-fund. At that time, he had 336 shares of Bank stock and 54 Bank bonds invested in the sub-fund. On or before December 14, 1981, plaintiff elected to liquidate his holdings in the sub-fund and reinvest the proceeds in the new Fund D. Defendant, as trustee, liquidated the shares of Bank stock from December 21, 1981 through January 12, 1982. All of the bonds were sold on January 12, 1982. As a result of these transactions plaintiff's account in Fund D was credited with 482 shares of Bank stock. Plaintiff, however, claimed that the liquidation of his sub-fund holdings should have resulted in 503.2023 shares being credited to his account in Fund D.

Immediately upon receipt of the quarterly statement for his Fund D account plaintiff wrote to Lawrence Lewis, a senior vice-president of the Bank and member of the Committee to complain of the shortfall. Defendant's response, sent over six months after it received plaintiff's inquiry, stated that no error had been made and, therefore, his account would not be credited with the additional stock. Plaintiff's subsequent inquiries were, for the most part, unanswered. Plaintiff initiated suit in the Justice Court of the Town of Mamaroneck seeking to recover the shortfall in his pension plan. Defendants removed the action to this Court on the basis of ERISA.

## DISCUSSION

Plaintiff's first cause of action alleged that defendant, as trustee of the Profit–Sharing Plan, breached its fiduciary duty under 29 U.S.C. § 1104. That provision of ERISA provides that:

(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan....

29 U.S.C. § 1104. Plaintiff based his claim of a violation of this section on allegations that (1) defendant only allowed participants in the sub-fund one weekend to decide whether to invest in Fund D; (2) defendant failed to discharge its duties in the sole interest of the sub-fund by selling $234,000 in bonds in one day; (3) defendant failed to comply with the trading strategy delineated in the December 9th memo; and (4) defendant generated unnecessary administrative expenses, in the form of broker's commissions, by not allowing participants to transfer funds from the sub-fund directly into Fund D.

A. *Failure to Comply with Trading Strategy*

█ "As a general rule federal courts should refrain from interfering with the administration of a pension plan unless its trustee or administrator has acted in an arbitrary or capricious manner." *Building Trades v. New York State Teamsters Conference,* 761 F.2d 115, 117 (2d Cir.1985). The discretionary decisions of a trustee should not be overturned unless it can be shown that the trustee acted in bad faith. *See Miles v. New York State Teamsters Conference,* 698 F.2d 593, 599 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 915 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Poggi v.*

*N.Y. Shipping Association–International,* 624 F.Supp. 983, 985 (S.D.N.Y.1985).

█ However, "[w]here the trustees of a plan impose a standard not required by the plan's provision, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles,* 698 F.2d at 599; *see Morgan v. Mullins,* 643 F.2d 1320, 1321 (8th Cir.1981); *Maness v. Williams,* 513 F.2d 1264, 1267 (8th Cir.1975); *Poggi,* 624 F.Supp. at 983. In addition, section 1104(a)(1)(D) requires fiduciaries to act in accordance with the instructions governing a plan. The trustees have a "statutory fiduciary duty to uphold the purposes of the plan." *Schoenholtz v. Doniger,* 628 F.Supp. 1420, 1428 (S.D.N.Y.1986) (quoting *Fine v. Semet,* 514 F.Supp. 34 (S.D.Fla. 1981), *aff'd,* 699 F.2d 1091 (11th Cir.1983)).

█ As judged by this standard and in view of the facts discussed above, the Court finds that defendant breached its fiduciary duty and failed to fulfill its obligation as trustee to act in accordance with the general goal, intent, and specific purpose of the Plan. The December 9th memo stated in clear, unambiguous terms that all stocks and bonds which were to be liquidated would be sold "through December 31, 1981." Plaintiff's Exh. 4, at 2. This was defendant's document and contained its choice of language. The Random House College Dictionary defines "through" as meaning "to and including." The use of the term "through" did not, therefore, as defendant suggests, give it the discretion to time the sales of the stocks and bonds into January. Defendant knew the meaning of "through." There is no ambiguity in the language of the memo and if there were any it would have to be resolved against the draftsman of the document. *See Hebert v. Mass. Teachers Ass'n Retirement Plan,* 627 F.Supp. 535 (D.Mass.1986). That the sub-fund holdings were all to be liquidated by December 31, 1981 is further supported by the memo's explicit statement that "[t]he net proceeds of the sale ... will be credited to [a partici-

pant's] account, after the *December 31st* valuation...." Plaintiff's Exh. 4, at 1 (emphasis added).

Furthermore, defendant failed to offer credible testimony explaining its failure to comply with the Plan's instructions as set forth in the December 9th memo. Defendant argued that the bonds could not be sold until after the stock had been sold as the price of the stocks and bonds are so closely intertwined that selling the bonds prior to the completion of the sale of the stock would depress the value of the stock. Defendant, however, failed to support this argument with credible evidence. In addition, this argument appears to be a direct contradiction of Mr. Jamieson's expert testimony that plaintiff was not entitled to receive the price of the bonds quoted in the Wall Street Journal as the bonds were not sold on the open market.

Mr. Jamieson, a vice-president in the Bank's equity trading department, further testified that the bonds were sold on January 12, 1982 as that is the date he first received the sell order from the trustees. Mr. Jamieson did not testify as to whether he received any instructions from defendant as to the manner in which the sale of the bonds should be executed. Based on Mr. Jamieson's testimony, the Court can only conclude that it was his decision to sell all of the bonds in one day. Mr. Jamieson's actions in selling all of the bonds in one day were a direct contradiction of defendant's response to plaintiff's initial inquiry in which defendant informed the plaintiff that he did not receive the price for his bonds that he expected as the bonds could not all be sold in one day. Plaintiff's Exh. 15. In light of all the conflicting and contradictory testimony the Court concludes that defendant failed to act with the appropriate care, skill, prudence and diligence required by ERISA. *See Donovan v. Bierwirth*, 538 F.Supp. 463, 470 (E.D.N.Y.1981), *mod. on other grounds*, 680 F.2d 263 (2d Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983).

Defendant's argument that it did not breach its fiduciary duty as plaintiff was not mislead as to the sale date of the sub-fund holdings due to the information contained in the prospectus and the December 7th memos is without merit. First, a Profit–Sharing Plan participant who was also a sub-fund participant was entitled to (1) elect to transfer assets from his Profit–Sharing Plan under the December 7th memos and prospectus, *or* (2) elect to transfer assets from his sub-fund under the December 9th memo, *or* (3) elect to transfer assets from both accounts, *or* (4) elect not to transfer assets from either account. Second, it should be noted that the Plan document contained in the prospectus, as well as the December 7th memos are completely silent as to the rights of sub-fund participants. All three documents deal exclusively with the Profit–Sharing and Stock Purchase Plans. Third, the December 9th memo gives no indication that it is not an integrated document. The memo never refers participants to either the prospectus or the December 7th memos for additional information regarding their rights under the new amendment. Fourth, even if a participant read the other documents regarding the new amendment, each memo and the prospectus recite the use of different dates to determine the purchase price of Bank stock for Fund D accounts. This would be of little assistance to a participant trying to determine the value he could hope to receive for the liquidation of his sub-fund holdings.

The December 9th memo made a firm commitment to liquidate the sub-fund holdings by December 31, 1981. Plaintiff was entitled to rely on this commitment and suffered an injury when defendant breached it. Accordingly, the Court finds that defendant failed to fulfill its obligation as trustee to act in accordance with the general goal, intent and specific instructions of the Plan in violation of 29 U.S.C. § 1104(a)(1)(D) and such actions were arbitrary and capricious.

B.  *Failure to Defray Administrative Expenses*

■  Plaintiff also claimed that defendant breached its fiduciary duty to the Profit–Sharing Plan by "generating unnecessary buy and sell orders instead of trans-

ferring the stock from one fund to another and [then] purchasing the shortfall." Plaintiff's Trial Brief, 86 Civ. 5458 (JMC) (S.D.N.Y.1987). It was plaintiff's contention that by these actions "the Trustees created commission expenses ... violat[ing] the provision of Section 404 of ERISA that require[s] trustees to defray plan administration expenses." *Id.* Plaintiff, however, failed to establish at trial that brokers' commissions fall within "plan administrative expenses" as defined by § 1104(a)(1)(A)(ii) of ERISA. In addition, plaintiff failed to establish that the stock could in fact be transferred and that, therefore, it was unnecessary to sell the stock thereby incurring brokers' commissions. Accordingly, this claim is dismissed.

### C. *Failure to Discharge Duties for the Benefit of Participants*

█ Likewise, plaintiff's claim that the defendant failed to discharge its duties for the sole benefit of the participants is also without merit. Plaintiff based this claim on allegations that (1) the Bank timed the introduction of Fund D so as to put the participants at a disadvantage and (2) defendant sold all of the bonds to be liquidated in one day. Plaintiff's Trial Brief at 2–3.

While it is true that plaintiff had only one week to determine if he wished his Profit–Sharing Plan contribution to be invested in Fund D and only one weekend in which to decide whether he wished to liquidate his sub-fund holdings, the Court fails to see any disadvantage to plaintiff or advantage gained by defendant as a result of the timing of the new amendment. Fund D allowed Profit–Sharing Plan participants to become shareholders of the Bank while at the same time receiving a 5% discount on their investment. Profit–Sharing Plan participants were not required to invest any portion of their profit-sharing contribution in Fund D, nor were sub-fund participants required to liquidate their existing holdings. All decisions regarding the investment of the profit-sharing contribution or the liquidation of sub-fund holdings were left to the sole discretion of the participants. The Bank had no control over the

amount of sub-fund holdings that would be liquidated or the amount of contributions that would be invested in Fund D. More importantly, plaintiff did not allege that he would not have liquidated his sub-fund holdings if he had been granted more time to ponder the decision. Defendant's actions in the timing of the liquidation offer were not, therefore, arbitrary and capricious. Accordingly, this claim is dismissed.

More troublesome, however, is plaintiff's claim that defendant failed to act for the sole benefit of the participants when it chose to sell all the bonds in one day. "ERISA clearly assumes that Trustees will act to ensure that a plan receives all the funds to which it is entitled, so that the funds can be used on behalf of participants...." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, *rehearing denied,* 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985). Plaintiff alleged that by trading $234,000 in bonds in one day defendant ensured that the bonds would not receive the best possible price.

Defendant in its response to plaintiff's first inquiry regarding the shortfall in his Fund D account stated that "[d]ue to the number of liquidations it would not have been possible, *or wise,* to sell all the shares and debentures in *one* day." Plaintiff's Exh. 15 (emphasis added and emphasis in original). The expert testimony at trial clearly established that the Bank's stock is a thinly-traded stock. Furthermore, defendant argues in its post-trial memoranda that, given the market conditions, if all of the stocks and bonds were sold *on* December 31, a 1 and ½ point discount would have to have been taken on each share. Defendant's Trial Memorandum at 16, 86 Civ. 5448 (JMC) (S.D.N.Y. Dec. 1, 1987) (emphasis added). Defendant has, therefore, evinced knowledge that by selling all of the bonds in one day it may not have received the best possible price.

However, the Court has already concluded that it may not have been the trustees' decision to sell all of the bonds in one day. Furthermore, the testimony at trial also

conclusively established that the price of the Bank stock was declining steadily during the beginning of January 1982. Additionally, plaintiff failed to establish that given the state of the market the bonds would have received a better price had their sale been spread out over a few days. In light of this lack of evidence it would, therefore, be a matter of pure conjecture to determine that defendant did not receive the best possible price for the bonds. Accordingly, this claim is dismissed.

D. *Failure to Follow ERISA's Procedural Requirements*

■ Plaintiff's second cause of action alleged that defendant violated certain procedural requirements set forth in ERISA. Section 1133 of ERISA provides that:

> every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, ...

29 U.S.C. § 1133. Plaintiff based this claim on allegations that the Bank did not respond in writing to his request that his Fund D account be credited with the additional shares he believed the liquidation of his sub-fund should have realized. Plaintiff further alleged that the Bank failed to adequately explain the denial of his benefits and advise him of the procedure for appealing that denial.

The testimony at trial established that the Bank did not respond adequately to plaintiff's inquiries. Indeed, the testimony of the Bank's employees highlighted the complete lack of procedures employed by the Bank for responding to employee's complaints. Everyone seemed to think that someone else was responding to plaintiff's letters with the result being that very few responses were actually received by the plaintiff. Those responses that plaintiff did receive failed to explain in detail the reasons for the delay in the liquidation of the bonds. The Court finds, however, that the defendant did not violate section 1133.

The only benefit guaranteed to plaintiff in the December 9th memo was a 5% discount on the purchase price of Bank stock. There was abundant evidence at trial that the stock purchased for plaintiff's Fund D account was purchased at a discount of 5%. Plaintiff was neither promised an increase in his holdings nor a specific sale price if he chose to liquidate his sub-fund holdings and reinvest in Fund D. However, plaintiff did in fact realize an increase in his holdings. Plaintiff was not, therefore, denied a benefit, but rather, was denied a specific rate of return on his investment.

Plaintiff has not cited to the Court any authority, and indeed, the Court could find none, to suggest that § 1133 applies to a denial of a specific rate of return on an investment. On the contrary, the law seems to indicate that § 1133 does not apply to the facts in this case. In *Pompano*, the Second Circuit, in determining that a denial of a claim to receive benefits in a lump sum was not a denial of benefits under ERISA mandating a written notice found that:

> there is strong evidence to suggest that the procedural protection set forth in the statute is intended to safeguard the participants' substantive rights to receive benefits. The House Conference Report explains that § 1133 was included as a compromise means of requiring procedures for resolving certain disputes between the plan administrator and participants. The House bill contained no such provision and the Senate bill provided for review and arbitration of any dispute. The final compromise version only covers denial of a 'claim for benefits.' H.R.Rep. No. 93-1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5038, 5108.... It is abundantly clear that the purpose Congress had in mind was to provide safeguards to participants for the payment of their benefits.

*Pompano*, 680 F.2d at 916. Neither the Act, nor its legislative history mandate a specific rate of return on an investment. Furthermore, plaintiff admitted at trial that he did not file a "claim" as outlined in the Bank's Employee Handbook. Finally,

defendant has never denied plaintiff's right to receive his substantive benefits due him under the plan. Plaintiff was not, therefore, "denied a benefit" necessitating a written notice of denial and explanation of the appeals process under § 1133(1). Accordingly, this claim is dismissed.

### E. *Damages*

■ The statutory provisions of ERISA grant the Court wide discretion in fashioning relief to protect the rights of beneficiaries. *See Schoenholtz v. Doniger,* 657 F.Supp. 899 (S.D.N.Y.1987). In the instant action, defendant breached its obligation to administer the Plan in accordance with the Plan's instructions by not selling all of the sub-fund holdings by December 31, 1981.

The general rule for measuring damages for a breach of contract is that amount necessary to put the plaintiff in the same economic position that he would have been in had the defendant fulfilled the contract. *Adams v. Lindblad Travel Inc.,* 730 F.2d 89 (2d Cir.1984); *Wallace Steel Inc. v. Ingersoll-Rand Co.,* 739 F.2d 112 (2d Cir. 1984). In calculating damages the value of personal property may be proven by establishing the market value of the property. *See Wallace,* 739 F.2d at 115.

The plaintiff asserts that in addition to the "shortfall" in his account which occurred due to defendant's failure to follow the December 9th memo, he is entitled to damages to compensate him for the dividend payments and stock splits that have occurred since January 1982. Plaintiff alleged that depending on the dates the Court uses to calculate the price he should have received in his liquidation, these damages amount to either $5,937, $4,543 or $4,410.

■ Although the Court has an obligation to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights, *see Traguth v. Zuck,* 710 F.2d 90, 94 (2d Cir.1983), "[t]he right of self-representation does not

exempt a party from compliance with the relevant rules of procedural and substantive law." *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981).

Plaintiff, in pursuing this action apparently never availed himself of the use of a law library. If he had, he would have discovered that only those damages proven with a reasonable degree of certainty may be awarded. *See Restatement (Second) of Contracts § 352.* Plaintiff, however, failed to introduce any evidence at trial as to the dividends paid and stock splits that occurred. In addition, plaintiff was not qualified as an expert on the valuation of stocks and bonds and his opinion on the amount of damages he has suffered is, therefore, not binding on the Court.

■ Fortunately for plaintiff, the defendant introduced sufficient evidence to establish the value of the Bank's stocks' dividends up until plaintiff liquidated his Fund D holdings. The damages in this case are, therefore, to be calculated as follows.

The amount invested by a participant is equal to the sum of the proceeds of the sale of the stock and bonds. Each participant receives the average price per share and per bond. The average price is equal to the net proceeds of the sale (gross proceeds minus a brokerage commission and Securities and Exchange Commission ["SEC"] fees) divided by the total number of shares of stock or bonds sold.

Sub-fund participants elected to liquidate a total of 16,772 shares of stock and $234,-000 in bonds. As of the close of the market on December 31, 1981, 9,450 shares of stock had been sold. If the bonds had been sold prior to December 31, they would have been converted into shares of stock. $234,-000 in bonds convert into 6,240 shares of stock.[1] A total of 13,562 additional shares, therefore, should have been sold prior to December 31, 1981.

The Bank received an average price of $43,1287 a share for the stock that was

---

1. The amount of shares that a given number of bonds would convert into is determined by dividing the dollar amount of the bonds by the

conversion price. In this case, there was $234,-000 in bonds with a conversion price of $37.50 per $100 bond equaling 6,240 shares of stock.

sold during December, realizing net proceeds of $407,566.45. If the 13,562 shares had been sold prior to December 31, that sale would have realized net proceeds of $584,911.43. These sales would have generated $1,763.06 in brokers' commissions and $19.05 in SEC fees, realizing total net proceeds of $583,129.32. If all of the stocks and bonds had been sold prior to December 31, net proceeds of $990,695.77 would have been realized. The average sale price of the stock would, therefore, have been $43.0513.

The plaintiff liquidated 336 shares of stock and 54 bonds. Plaintiff's bonds convert into 144 shares of stock. Plaintiff, therefore, liquidated a total of 480 shares of stock. Plaintiff should, therefore, have realized $20,664.624 ($43.0513 x 480) for his liquidation. In fact, plaintiff realized only $19,675.65, resulting in a shortfall of $988.974.

As the December 9th memo clearly states that stock for Fund D was to be purchased based on the average price of the five trading days ending December 31, 1981, that $988.974 would have purchased an additional 24.3159 shares at a discounted price of $40.6718 a share.[2] These shares realized a quarterly dividend, *see* Defendant's Trial Memorandum, Exh. J, thus, at the time plaintiff liquidated his Fund D account he would have held 26.3025 additional shares.[3] At the time he liquidated his Fund D account, plaintiff received $47.316 per share. Plaintiff's damages, therefore, are the amount he would have received for his 26.3025 shares, which is equal to approximately $1,244.53 plus the February dividend on these shares. Defendant is directed to submit a proposed judgment reflecting these figures along with prejudgment interest from February 2, 1983, the date on which all of plaintiff's Bank shares were sold, *see* Plaintiff's Exh. 17 c, to the date of judgment and post-judgment interest from thereafter.

## CONCLUSION

For all of the foregoing reasons, plaintiff is entitled to recover on his claim that defendant breached its fiduciary duty by failing to act in accordance with the instructions of the Profit–Sharing Plan. The rest of plaintiff's claims are dismissed. Judgment accordingly.

SO ORDERED.

---

**2.** The average daily price of the shares for the last five trading days of December 1981 was $42.8125. The discounted purchase price of Bank stock is determined by multiplying the five-day average daily price of the shares by 95%.

**3.** The Court rejects defendant's testimony that "all things being equal" the shares would have sold at a ¾ of a point discount in December. As previously noted, the price of Bank stock was declining in January 1982 and defendant presented no evidence to establish that all things would have been equal. Although the Court adopts defendant's evidence as to the computation of plaintiff's damages, all of its figures have been adjusted to reflect the lack of a ¾ of a point discount. It follows logically that by rejecting defendant's evidence as to a ¾ of a point discount the Court does not find credible defendant's argument that "in reality" a 1 and ½ point discount would have been taken.